# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

DENNIS D. JACKSON,

                  Petitioner,            :    Case No. 3:13-cv-347

    - vs -                            District Judge Thomas M. Rose
                                     Magistrate Judge Michael R. Merz

WARDEN, Lebanon Correctional
  Institution,

                            :

                Respondent.

# REPORT AND RECOMMENDATIONS

This is an action pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. Petitioner Dennis Jackson seeks release from a sentence of twenty-eight years to life imprisonment imposed on him in the Montgomery County Common Pleas Court upon his conviction on three counts of murder, two counts of aggravated robbery, and counts of aggravated burglary and felonious assault with firearm specifications (Petition, Doc. No. 1, ¶¶ 3, 5, PageID 4.)

On the Court's Order (Doc. No. 3), the Respondent has filed the state court record (Doc. No. 6) and a Return of Writ (Doc. No. 7). Petitioner has responded with a Reply (Doc. No. 9) and a Motion to Expand the Record (Doc. No. 8). These last filings make the case ripe for decision.

Jackson pleads the following grounds for relief:

> **GROUND ONE:** The State's own witnesses, on the day of the crime informed police officers that the person responsible was wearing a "Dark" or "Black" jacket or hoodie, yet even though the Kroger video proved Petitioner was wearing a multiple colors and

1

design jacket, and the fact that no forensic evidence connects him to the crime, and the fact that he is actually innocent.

**GROUND TWO**: The State's case against Petitioner was the product of the prosecutor's intent to obtain a conviction at any costs, guilt or innocence meant nothing once the State placed their evil eye on your Petitioner guilt or innocence did not matter, by any means necessary a conviction would be had.

**GROUND THREE:** Thomas Horn was no more than [a] guilty person, who used the State as a "Get Out Of Jail Card" as long as he would do whatever the State ask[ed] to help them obtain a conviction against someone the State knew was innocent, Petitioner should have been able to confront Mr. Horn.

**GROUND FOUR:** Horn and Carl were present when the shooting occurred, and both said the person who shot West had on all black, and Carl even said a black sweatshirt hoodie, not once during either trial did anyone say Petitioner wore all black or a hoodie, it is clear in the record Petitioner had on a multiple color jacket.

**GROUND FIVE**: Even viewing the evidence in a light most favorable to the prosecution, no rational trier of fact should have found the essential elements of the crime proven beyond a reasonable doubt, because everything and the actual evidence pointed to someone other than the Petitioner.

**GROUND SIX**: Appellant was wrongfully convicted of entering an apartment to commit a theft offenses and in the course of those events is alleged to have shot and killed Antoine West in a single course of conduct, which your Petitioner had no knowledge that such a theft offense because he was not in that part of town when the crime occurred.

**GROUND SEVEN:** Petitioner was arrested on April 5, 2010 and remained in custody at all times, and states that his rights to a speedy trial was violated.

**GROUND EIGHT:** Petitioner asserts that tainted evidence was placed before the jury that prejudiced my case without first being properly authenticated.

**GROUND NINE**: Petitioner asserts that if there has ever been a clearer case of "Ineffective Assistance of Counsel," there can be none greater than the one sub judice, if counsel's actions in the misrepresentation of your Petitioner is to go without sanctions or

2

some form of punishment, effective assistance of counsel is just meaningless words.

**GROUND TEN**: Petitioner assert that the State's star witness "Thomas Horn" repeatedly informed the 911 operator several times that he did not know the shooter, and all of the State's witnesses gave physical descriptions of the shooter which is inconsistent with your petitioner.

**GROUND ELEVEN**: Petitioner asserts that any time the State knows they can do anything without any fear about their misconduct, which in the case sub judice was deliberate and intentional.

(Petition, Doc. No. 1.)

## Cognizability in Federal Habeas Corpus

The Warden asserts that each of Jackson's Grounds for Relief fails to state a claim upon which habeas corpus relief can be granted (Return of Writ, Doc. No. 7, PageID 1928-39).

Federal habeas corpus is available only to correct federal constitutional violations.  28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. ___, 131 S. Ct. 13, 178 L. Ed. 2d 276 (2010)*; Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983).   "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

At the same time, it must be noted that Petitioner Jackson is proceeding *pro se* and litigants in that position are entitled to a liberal construction of their pleadings.  *Williams v. CSX Transportation Co., Inc.,* 643 F.3d 502, 510 (6th Cir. 2011), *citing Federal Exp. Corp. V.*

*Holowecki,* 552 US. 389, 402 (1998); *see also*, *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *McNeil v. United States,* 508 U.S. 106, 113 (1993).

When read together, Jackson's First, Fourth, Fifth, Sixth, and Tenth Grounds for Relief, considered together, state a claim that the convictions in this case are not supported by sufficient evidence.  As a matter of constitutional law, the Fourteenth Amendment requires that a criminal conviction be obtained on proof sufficient to persuade a rational trier of the facts of guilt beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc).

The Warden is correct that Jackson has not pled that Grounds One, Four, Five, Six, and Ten come within a particular constitutional guarantee, but they read easily on the case law cited in the preceding paragraph.  Indeed, Jackson quotes the governing standard from *Jackson v. Virginia*, 443 U.S. 307 (1979), in the Fifth Ground for Relief.  The Magistrate Judge concludes these five Grounds for Relief, taken together, state a claim that the convictions are not supported by sufficient evidence.

The Court however agrees with Respondent that insofar as Jackson is making a claim that he is entitled to habeas relief because he is actually innocent, he has failed to state a claim.  The Supreme Court of the United States has never recognized actual innocence as a freestanding claim under the Constitution.  A claim of actual innocence alone is insufficient to warrant habeas relief. *Herrera v. Collins*, 506 U.S. 390 (1993).

> Case law in the Sixth Circuit establishes that the Supreme Court of the United States has never recognized a free-standing or substantive actual innocence claim. *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007), *citing Zuern v. Tate*, 336 F.3d 478, 482, n.1 (6th Cir. 2003), and *Staley v. Jones*, 239 F.3d 769, 780, n.12 (6th Cir. 2001). The Supreme Court has twice suggested that a "truly

persuasive demonstration" of actual innocence would render a petitioner's execution unconstitutional. *Herrera v Collins,* 506 U.S. 390, 417 (1993); *House v. Bell*, 547 U.S. 518 (2006).

*Raymond v. Sheets*, 2012 U.S. Dist. LEXIS 160374, *26-27 (S.D. Ohio Nov. 8, 2012).

Actual innocence may, however, be relevant to excuse a procedural default on another ground of habeas relief.

> [A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup, 513 U. S., at 329, 115 S. Ct. 851, 130 L. Ed. 2d 808*; see *House, 547 U. S., at 538, 126 S. Ct. 2064, 165 L. Ed. 2d. 1* (emphasizing that the *Schlup* standard is "demanding" and seldom met). And in making an assessment of the kind *Schlup* envisioned, "the timing of the [petition]" is a factor bearing on the "reliability of th[e] evidence" purporting to show actual innocence. *Schlup, 513 U. S., at 332, 115 S. Ct. 851, 130 L. Ed. 2d. 808.*
>
> * * *
>
> [A] federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown.

*McQuiggin v. Perkins*, 569 U.S. ___, 133 S. Ct. 1924, 1928, 185 L. Ed. 2d 1019, 1035 (2013).

For proof of his actual innocence, Jackson relies on the nine exhibits he wishes to add to the record with his Motion to Supplement (Doc. No. 8).

> Exhibit A[1] (PageID 1985-89) Trotwood Police Incident Report on March 19, 2010, of an assault on Shevonda Leslie by Antione West with attachments
>
> Exhibit B (PageID 1990-91) Trotwood Police Report by Officer Troy Dexter regarding a March 20, 2010, interviews with Brandon Harris and Phil LNU.

---

[1] Although Jackson identifies the exhibits in his Motion, he has not labeled them as they are attached to the Motion.

Exhibit C (PageID 1992)  Trotwood Police Report by Officer David Yaney dated March 21, 2010, of a conversation with a confidential informant.

Exhibit D (PageID 1993) Trotwood Police Report by Officer Michael Pigman dated March 23, 2010, of conversations with Thomas Horn.

Exhibit E (PageID 1994) March 20, 2010, written statement of Thomas Horn.

Exhibit F (PageID 1995-96)  Trotwood Police Report by Officer Troy Dexter dated March 22, 2010, concerning statements made by Donna Hayden, the victim's mother.

Exhibit G (PageID 1997) Trotwood police Report by Officer Michael Richardson dated March 22, 2010, regarding March 18, 2010, call to 4360 Nevada regarding the domestic ditrubance between Shevonda Leslie and Antione West.

Exhibit H (PageID 1998-2000) Trotwood Police Report by Officer Michael Pigman dated March 22, 2010, regarding attempts to locate Brandon Harris and an eventual interview with him.

Exhibit I (PageID 2001) Trotwood Police Report date March 27, 2010, by Officer Thomas Quigley relating additional information from the domestic violence call on March 19, 2010.

These nine exhibits do not constitute "new evidence" within the meaning of that term as used by the United States Supreme Court in habeas corpus cases.

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id*. at 321.

*Souter v. Jones,* 395 F.3d 577, 590 (6th Cir. 2005).  All of the exhibits relied on are statements of police officers reporting conversations with other persons.  None of those persons purports to have been an eyewitness to the crime and none of them gave statements under oath.  Moreover, all of these reports were made well before the trial and would have been available to Jackson or his counsel under the Ohio Public Records Act.  They simply do not constitute new evidence of

Jackson's actual innocence.  At most they suggest that other people may have had a motive to harm Antione West.  The Motion to Expand the Record is DENIED.

Respondent claims Ground Two is not cognizable in habeas corpus (Return of Writ, Doc. No. 7, PageID 1932).  In his Traverse Jackson clarifies that he intends to raise in Ground Two a claim that his conviction is barred by the Double Jeopardy Clause because the State retried him after his first trial ended in a mistrial.  That claim is cognizable in habeas and the Court will treat the Petition, as supplemented by the Traverse, as raising a Double Jeopardy claim.

Respondent claims Ground Three is not cognizable in habeas corpus because all it does is allege Thomas Horn lied (Return of Writ, Doc. No. 7, PageID 1932).  Respondent is correct as the Petition stands.  But here, too, the Petition is supplemented by the Traverse which claims the State used Horn's testimony knowing that it was perjured.  This also states a claim under the Constitution.

Respondent asserts Ground Seven fails to state a cognizable claim when it asserts Jackson's speedy trial rights were violated.  The Court disagrees as the Sixth Amendment to the United States Constitution guarantees a speedy trial.  Whether this claim was adequately presented to the state courts as a federal constitutional claim, which Respondent claims was not done, will be discussed below.

In Ground Eight Jackson asserts that tainted evidence which was not properly authenticated was placed before the jury.  As Jackson argues this claim in his Traverse, it is a question of Ohio evidence law.  As noted above, evidence questions are not cognizable in federal habeas corpus.

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th

Cir.1988);  *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir. 1983);  *Bell v. Arn,* 536 F.2d 123 (6th Cir., 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir. 1975). Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007); *Bugh v. Mitchell,* 329 F.3d 496 (6th Cir. 2003), *citing Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2000).  Courts have, however, defined the category of infractions that violate fundamental fairness very narrowly.  *Bugh, quoting Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)(*quoting Dowling v. United States*, 493 U.S. 342, 352 (1990)).  "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker,* 224 F.3d  542, 552 (6th Cir. 2000)(*quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

The Court agrees with Respondent that Jackson's Eighth Ground for Relief does not state a claim under the Constitution and it should be dismissed.

In Ground Nine, Jackson asserts ineffective assistance of trial counsel in very conclusory terms.  The Petition fails the Habeas Rule 2 test in that it does not plead any facts on which Jackson bases his claim of ineffective assistance of trial counsel.  Jackson specifies this claim in the Traverse, asserting trial counsel was ineffective in that:

> (1) Jackson informed him before trial of who his alibi witness was;
>
> (2) he did not object to Detective Pigman's hearsay testimony that Thomas Horn identified Jackson in a photo array;
>
> (3) he did not object to Paula Papke's testimony about cellphone records;
>
> (4) he did not object to Pigman's hearsay testimony about Deon's Sims statement in a telephone call allegedly made to Jackson about

getting his gun back;

(5) he did not object to Pigman's testimony that he verified Sims' ownership of the murder weapon through an ATF agent;

(6) he did not object to Pigman's trial testimony about his third interview with Horn that nothing had changed from the prior two interviews;

(7) he did not object to various questions asked of Horn during his deposition;

(8) he did not impeach Horn with his motion to suppress testimony;

(9) he did not object to the prosecutor's asking Horn why he did not appear at trial; and

(10) he did not object to Pigman's hearsay testimony that Sims picked Jackson out of a photo array.

(Traverse, Doc.No. 9, PageID 2015-16).  The Magistrate Judge concludes that, as supplemented by the Traverse, Jackson's Ninth Ground for Relief does state a claim.

Respondent asserts Ground Eleven also does not state a claim cognizable in federal habeas corpus.  As pled, the Eleventh Ground only claims that state misconduct in a criminal trial must be sanctioned.  As specified further in the Traverse, the Eleventh Ground complains of prosecutorial misconduct which, if it occurred, could be a constitutional violation.  The Court considers the Eleventh Ground for Relief along with Ground Three below

**Grounds One, Four, Five, Six, and Ten:  Insufficiency of the Evidence**

As noted above, these five Grounds for Relief taken together state a claim for relief under the Fourteenth Amendment, to wit, that there was insufficient evidence presented to the jury to convict Jackson.

Respondent asserts that Grounds One, Four, Six, and Ten are procedurally defaulted by failure to present them to the state courts (Return of Writ, Doc. No. 7, PageID 1944-45).  The Magistrate Judge notes that Jackson's Fifth Assignment of Error on direct appeal was that there was insufficient evidence to convict.  The same claim was raised as the Fifth Proposition of law on appeal to the Ohio Supreme Court.  This claim is therefore not procedurally defaulted.

The Second District Court of Appeals decided the sufficiency of the evidence claim on the merits as follows:[2]

> **[\*P111]** Jackson's fourth and fifth assignments of error state:
> APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT APPELLANT'S CONVICTION.
>
> **[\*P112]** Jackson challenges both the sufficiency and the weight of the evidence against him.
>
> **[\*P113]** An argument based on the sufficiency of the evidence challenges whether the State presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541 (1999). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt

---

[2] The manifest weight claim does not state a claim under the federal Constitution, but the state court holding is quoted here because, as is often the case, the manifest weight and sufficiency claims were decided together.

beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

[**P114**] "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009 Ohio 525, ¶ 12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1st Dist 1983); *State v. Elmore*, 111 Ohio St.3d 515, 2006 Ohio 6207, 857 N.E.2d 547, ¶ 44.

[**P115**] Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id*

[**P116**] The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

[**P117**] The State presented the following evidence at trial:

[**P118**] Several witnesses testified that, on the afternoon and evening of March 19, 2010, Antoine West and several of his friends, including Jeremy White, Thomas Horn, and Kimberly Carl, had been "hanging out" together at the Deer Creek apartment complex in Trotwood. White's girlfriend, West's mother, and Carl all lived in separate units of the apartment complex, and the friends spent time in several apartments. West sold marijuana to numerous people throughout the day and was seen with a large amount of cash.

[**P119**] Later in the evening, White, Horn, Carl, and West were at West's mother's apartment, Unit 4716. Between 10:00 and 10:30

p.m., White left to return to his girlfriend's apartment. West, Horn, and Carl were watching television in the dark when, according to Carl and Horn, someone opened the apartment door without knocking or using force; the person "came in * * * smooth" and was several steps inside the apartment before he was noticed. He then ordered the occupants to "lay down" and pointed a gun at them. Carl and Horn moved toward the kitchen, where they attempted to conceal or shield themselves under some blankets near the washer and dryer, while West lunged toward the intruder. Carl and Horn heard some "tussling" and some shots fired. Carl and Horn did not hear anyone leave the apartment, so they waited a short time to come out from under the blanket. When they did, they found West, wounded, in the foyer of the apartment, with his pants partially pulled down and the pockets pulled out. They testified that West's pockets had not been pulled out earlier.

**[\*P120]** Horn called 911 on his cell phone from the exterior hallway of the apartment building, but he left before the police arrived. In his 911 call, he claimed not to know the identity of the shooter.

**[\*P121]** A neighbor, Tahira Elamin, and her guest, Alan Webb, were in the unit across the hall from Unit 4716 at the time of the shooting. They hid in a bedroom until the shooting stopped; then Elamin heard "rumbling" down the exterior stairwell and looked out the bedroom window. She saw an African-American man running from the building toward a gold car parked in the lot; the man was wearing a multi-colored jacket. When Webb and Elamin opened the door to Elamin's apartment moments later, they saw West in the foyer of the neighboring apartment, bleeding, and observed Horn (and possibly Carl) calling 911.

**[\*P122]** When police officers responded to Unit 4716, they found West seriously wounded and lying in the foyer of the apartment. Carl was present, but Horn was not. The initial EMT responders called for CareFlight, but West was pronounced dead at the scene a short time later. West had been shot in the top of his head, in his chest, and in his left hip and thigh. Shell casings were found in the vicinity of the body and at various places around the main room of the apartment. There was no money in West's pockets at the time of his death.

**[\*P123]** Later that night, a detective found a Springfield Armory .45 caliber gun in a grassy area of the apartment complex; forensic evidence linked the gun to West's shooting.

12

**[\*P124]** Dion Sims, an acquaintance of Jackson, testified that he was the owner of the Springfield Armory handgun. He further testified that Jackson had asked to borrow the gun on the evening of March 19, 2010, and Sims had given it to him. Sims became concerned early the next morning when a phone call from a friend alerted him to the fact that the gun may have been used in a crime at the Deer Creek Apartments. Sims attempted to go to the apartment complex to look for the gun, but he was deterred by the heavy police presence when he approached. Sims contacted an attorney who helped him arrange a meeting with the police, because he was afraid he would be blamed for the crime. Jackson never returned the gun to Sims.

**[\*P125]** When Horn was identified and located by the police, he initially claimed that he could not identify the shooter. However, he subsequently contacted Detective Pigman and identified Jackson, who was the boyfriend of one of Horn's cousins, as the shooter. Horn also identified Jackson in a photo array prepared by Detective Pigman. Horn indicated to Pigman that he was fearful about testifying against Jackson. Horn gave a deposition after he was arrested on a material witness warrant; in his deposition, which was played at trial, he claimed not to recall having identified a shooter, but acknowledged that he had made prior statements identifying Jackson.

**[\*P126]** When he was interviewed by the police, Jackson claimed that he had been staying with his son's mother, LaKesha Gray, in Kettering at the time of the shooting. Gray remembered the week well because her sister had died on March 15, and the funeral had taken place on March 20. After the funeral, Jackson had asked her to tell the police that he was with her from March 15 - 20. Gray initially lied to the police for Jackson, but when she learned from one of the detectives that they were investigating a homicide, she admitted that her earlier statement had been untrue. Jackson's cell phone records also indicated that he had been near Trotwood, not in Kettering, at the time of the shooting.

**[\*P127]** Jackson's girlfriend at the time of the shooting told police that she and Jackson had been at a Kroger store on Seibenthaler Avenue around noon on the day of the shooting. Using this information, the police obtained a March 19 surveillance video from the store. In the video, Jackson was wearing a multi-colored jacket. At trial, Elamin was asked whether the jacket in the video resembled the jacket she had seen on the

man who ran from her building the night of the shooting; she answered affirmatively.

[**P128**] There was no DNA or other forensic evidence linking Jackson to the shooting. Jackson was excluded as the contributor of DNA found in scrapings under one of West's fingernails and in West's pockets.

[**P129**] Although much of the evidence against Jackson was circumstantial, circumstantial evidence and direct evidence are of equal value, especially because some facts can only be proved by circumstantial evidence. *State v. Jenks,* 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991). The State's evidence, if believed by the jury, would convince the average mind of the defendant's guilt beyond a reasonable doubt. Thus, Jackson's conviction was not supported by insufficient evidence. Further, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice by weighing the evidence as it did. Accordingly, Jackson's conviction was not against the manifest weight of the evidence.

[**P130**] The fourth and fifth assignments of error are overruled.

*State v. Jackson,* 2012-Ohio-2335, 2012 Ohio App. LEXIS 2057 (2nd Dist. May 25, 2012).

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter,* 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone,* 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000). Here the Second District reviewed the sufficiency of the evidence claim employing state case law (*State v. Thompkins*) which embodies the same standard as *Jackson v. Virginia*, 443 U.S. 307 (1979). Jackson has not demonstrated how that decision was an objectively unreasonable application of *Jackson v. Virginia*. These four Grounds for Relief, considered together as raising a claim of the insufficiency of the evidence, are without merit and should be dismissed with prejudice.

**Ground Two:  Double Jeopardy**

Ground Two is construed above as raising a Double Jeopardy claim based upon Jackson's re-trial after a mistrial was declared.  This claim also was raised on direct appeal and decided by the Second District as follows:

> [*P27] "'The double jeopardy clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, protects a criminal defendant from repeated prosecutions for the same offense.' *State v. Draughon*, 10th Dist. Franklin No. 97APA11-1536, 1998 Ohio App. LEXIS 4148 (Sept. 1, 1998), citation omitted. 'When a trial court grants a criminal defendant's request for a mistrial, the double jeopardy clause does not bar a retrial.' *Id*. 'A narrow exception lies where the request for a mistrial is precipitated by prosecutorial misconduct that was intentionally calculated to cause or invite a mistrial.' *Id*, citing *State v. Doherty*, 20 Ohio App.3d 275, 20 Ohio B. 338, 485 N.E.2d 783 (1st Dist. 1984). 'Only where the prosecutorial conduct in question is intended to "goad" the defendant into moving for a mistrial may the defendant raise the bar of double jeopardy to a second trial after having succeeded in ending the first on his own motion.' *Id*, citation omitted." *State v. Simons*, 2d Dist. Champaign No. 99CA5, 2000 Ohio App. LEXIS 5411, 2000 WL 1726904, * 6 (Nov. 22, 2000).
>
> [*P28] With respect to prosecutorial misconduct, the trial court concluded that none of the prosecutor's conduct prior to Sims's statement about the lie detector test "would establish, even remotely * * * any prosecutorial misconduct" and that the comment was "not even remotely responsive to the question that had been posed." The court also observed that Sims chose to mention the polygraph test notwithstanding the prosecutor's instructions to Sims that he should not do so. Although the court acknowledged that the course of events resulting in a mistrial arguably benefitted the State,[FN 2 Horn had been arrested pursuant to the material witness warrant on October 8, 2010, before the second trial began, and his deposition was taken before he was released from custody.] the court found "absolutely no prosecutorial misconduct" and no basis to conclude that the State had intentionally caused a mistrial. The court overruled the motion to dismiss on double jeopardy grounds.

> **[\*P29]** The trial court reasonably concluded that no prosecutorial misconduct was involved in Sims's disclosure at trial that he had taken a lie detector test. In the absence of prosecutorial misconduct, double jeopardy did not bar Jackson's retrial, and the trial court properly overruled his motion to dismiss on double jeopardy grounds.

*State v. Jackson, supra.*

The Supreme Court has made it plain that the Double Jeopardy Clause protects against a second trial, not just against conviction at a second trial. *Abney v. United States,* 431 U.S. 651 (1977). "Once jeopardy attaches, prosecution of a defendant before a jury other than the original jury, excluding any contemporaneously empaneled and sworn alternates, is barred unless (1) there is a 'manifest necessity' for a mistrial or (2) the defendant either requests or consents to a mistrial." *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996); *see also United States v. Larry*, 536 F.2d 1149, 1152 (6th Cir. 1976). The Supreme Court first enunciated the manifest necessity doctrine in *United States v. Perez,* 22 U.S. (9 Wheat.) 579 (1824)(Story, J.), where it said that a mistrial based on manifest necessity must be declared only "with the greatest caution, under urgent circumstances, and for very plain and obvious causes. *See also Arizona v. Washington*, 434 U.S. 497 (1978).

In *United States v. Dinitz*, 424 U.S. 600 (1976), the Court declined to apply Justice Story's manifest necessity doctrine from *United States v. Perez*, 22 U.S. 579 (1824), to a case where the defendant requested the mistrial.

> Different considerations obtain, however, when the mistrial has been declared at the defendant's request. The reasons for the distinction were discussed in the plurality opinion in the *Jorn* case: "If that right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision

16

> whether or not to take the case from the jury when circumstances
> occur which might be thought to warrant a declaration of mistrial.
> Thus, where circumstances develop not attributable to
> prosecutorial or judicial overreaching, a motion by the defendant
> for mistrial is ordinarily assumed to remove any barrier to
> reprosecution, even if the defendant's motion is necessitated by
> prosecutorial or judicial error.

424 U.S. at 607.  In *United States v. Jorn*, 400 U.S. 470 (1971), the Court had held that a mistrial

brought about with the consent of the defendant would bar reprosecution if the circumstances

prompting the mistrial motion were brought about by prosecutorial or judicial overreaching.

What would be necessary to constitute such overreaching was specified by the Court in *Oregon*

*v. Kennedy*, 456 U.S. 667, 676 (1982), where the Court held that "[o]nly where the governmental

conduct in question is intended to 'goad' the defendant into moving for a mistrial" will the

Double Jeopardy Clause bar retrial.

Here the motion for mistrial was made by the defense after a witness volunteered that he

had taken a lie detector test.  Under those circumstances, there was no violation of the Double

Jeopardy Clause in retrying Jackson.  Ground Two should be dismissed with prejudice.

**Ground Three:  Prosecutorial Misconduct**

In his Third Ground for Relief, Jackson asserts the prosecutor engaged in misconduct by

using Thomas Horn's testimony when he knew it was perjured.  Jackson nowhere made any such

claim in the state courts.   His sole claim with any parallel are his Tenth and Eleventh

Assignments of Error which the state court of appeals decided as follows:

> **[\*P77]** Jackson's tenth assignment of error states: THE TRIAL
> COURT ERRED IN ALLOWING THE STATE TO USE
> LEADING QUESTIONS AND IMPEACH THEIR [SIC] OWN
> WITNESS, THOMAS HORN.

**[\*P78]** Jackson claims that the State should not have been allowed to impeach its own witness, Thomas Horn, because, although Horn's deposition testimony differed from his prior statements, the State did not show that it was surprised by the change in Horn's testimony. Jackson asserts that "[a]ny reasonable person would have believed Horn would recant, from his prior statements and failure to twice appear for trial."

**[\*P79]** Generally, a prior inconsistent statement is admissible only to impeach the declarant and should not be offered to prove the truth of the matter asserted. (Citations omitted.) *State v. Risden,* 2d Dist Montgomery No. 22930, 2010 Ohio 991, ¶ 18. When taken by surprise by testimony from its own witness that causes affirmative damage, a party may impeach its own witness concerning his prior inconsistent statement(s). *Id*; Evid.R. 607(A).

**[\*P80]** Ordinarily, "surprise" can be shown if the testimony is materially inconsistent with a prior statement and the party calling the witness did not have reason to believe that the witness would recant. *State v. Nolan,* 2d Dist. Clark No. 99-CA-24, 2000 Ohio App. LEXIS 900, 2000 WL 262658, *2 (March 10, 2000). "Affirmative damage" is established when the witness testifies to facts which contradict, deny, or harm the trial position of the party calling the witness. *Id*.

**[\*P81]** It is within the broad discretion of a trial court to determine whether a party is taken by surprise by the testimony of a witness called by that party, so as to permit that party to impeach its own witness. *State v. Dearmond,* 179 Ohio App.3d 63, 2008 Ohio 5519, 900 N.E.2d 692, ¶ 27 (2d Dist.); *Risden* at ¶ 18.

**[\*P82]** At the deposition (which was played at trial), the State claimed surprise after Horn testified that he had not recognized the assailant at the time of the shooting. Horn had previously given a statement to Detective Pigman and testified at the suppression hearing that Jackson was the shooter and was known to Horn because Jackson dated Horn's cousin. The trial court "accept[ed] that given what Mr. Horn had said previously both at — both in writing and also based on what he said at the Motion to Suppress hearing and what he had said to you [the prosecutor] at the pre-trial conference, that there is an affirmative showing of surprise." Thus, the court ruled that the State would be allowed to impeach Horn. The trial court did not address the issue of affirmative damage, but the damage caused by the change in Horn's testimony was

apparent, and Jackson does not argue that the State failed to show affirmative damage.

**[\*P83]** Jackson points out that, in addition to Horn's prior statements identifying Jackson as the shooter, Horn had stated on his 911 call and in his initial conversation with Detective Pigman that he could not identify the shooter. Based on Horn's differing accounts throughout the history of the case and his lack of cooperation with testifying, Jackson claims that the State could not have been surprised by Horn's deposition testimony.

**[\*P84]** Although Horn did deny knowing the identity of the shooter in the immediate aftermath of the shooting and the early stages of the investigation, he picked Jackson out of a photo array on April 1, 2010, less than two weeks after the shooting. There is no indication from the record that Horn disclaimed knowledge of the shooter's identity between April 1, 2010 and the day of his deposition testimony. Moreover, Horn's past assertions that he was "scared" about testifying against Jackson need not have suggested to the State, in themselves, that he was likely to change his testimony; he seemed to be dealing with his fear by attempting to avoid testifying altogether. We cannot conclude that the trial court abused its discretion in concluding that the State was surprised by Horn's testimony.

**[\*P85]** As part of the same discussion at trial, the trial court suggested that the court would "probably" have allowed the State to call Horn as a court's witness if the State had made such a request, "given the fact that [the State] had to pick him up as a material witness." Evid.R. 614(A) "authorizes the court to call a witness whom a party might otherwise call, on the party's 'suggestion' that the witness would then recant another, prior statement favorable to that party." "When the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness." *State v. Arnold,* 189 Ohio App.3d 507, 2010 Ohio 5379, 939 N.E.2d 218, at ¶ 44 (2d Dist.), citing *State v. Apanovitch,* 33 Ohio St. 3d 19, 514 N.E.2d 394 (1987). Based on this statement, Jackson likely suffered no prejudice as a result of the court's finding that the State was surprised by the change in Horn's testimony; if such a change had been anticipated, it appears that the court would have allowed the State to pursue similar questioning by cross-examining Horn as a court's witness, pursuant to Evid.R. 614(A).

**[\*P86]** The tenth assignment of error is overruled.

[*P87] Jackson's eleventh assignment of error states:

APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

[*P88] Jackson claims that the prosecutor engaged in misconduct and deprived him of a fair trial by improperly bolstering Horn's prior statements, by presenting the perjured testimony of Tahira Elamin, by improperly arguing that Horn's prior statements were "evidence to be used to prove the identity of appellant as the shooter," and by commenting in closing argument that details of a phone call Sims received the night of the shooting were unavailable because of a defense objection.

[*P89] In reviewing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones*, 90 Ohio St.3d 403, 420, 2000 Ohio 187, 739 N.E.2d 300 (2000). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id*., quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced and his conviction will not be reversed. *See State v. Loza*, 71 Ohio St.3d 61, 78, 1994 Ohio 409, 641 N.E.2d 1082 (1994), overruled on other grounds. We review the alleged wrongful conduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008 Ohio 2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

[*P90] With respect to the "improper bolstering" of Horn's testimony, Jackson claims that the prosecutor "gave the imprimatur of the State" to Horn's prior statements by questioning Horn about his previous meetings with prosecutors (at the suppression hearing and two pre-trial conferences) and asking whether he had identified Jackson as the shooter at those times. After initially stating that he did not recall what he had said on those occasions, Horn admitted that he made such statements. He also admitted telling the State that he was afraid of Jackson and his family, although not with "those exact words."

[*P91] This exchange did not involve any improper bolstering of Horn's testimony. The State impeached Horn's trial testimony with

his prior inconsistent statements, with the court's permission, pursuant to Evid.R. 613. While the questioning brought Horn's prior statements to the jury's attention, it did not vouch for them.

**[\*P92]** Jackson also claims that the prosecutor engaged in misconduct by presenting the testimony of Tahira Elamin. Elamin lived across the hall from the apartment in which the shooting occurred and was home at the time of the shooting. She testified that, after the shooting, she saw a black male running from the building in a multi-colored jacket. She was shown a surveillance video of Jackson at a Kroger store on the day of the shooting wearing a multi-colored jacket; she testified that the jacket worn by the person running from her building was similar to the jacket shown in the video.

**[\*P93]** Elamin was also questioned about the physical characteristics of the person who ran from her building. The day of the shooting, she told the police that the man was "about five-four." On direct examination, she stated that her estimation of his height had been "a guess," noting that she had been looking down on him from her second floor apartment window. On cross-examination, Elamin admitted that she had originally described the person she saw running from her building as a black male, 5'4" tall, with a small build, short hair, and a baseball cap; she had only seen the man from the back.

**[\*P94]** Although Elamin's physical description of the person who ran from her building did not match Jackson very well, this fact, standing alone, does not justify defense counsel's suggestions that Elamin committed perjury or that the State knowingly presented perjured testimony. Moreover, the State elicited testimony which was offered to explain why Elamin might have had a difficult time estimating the man's height: she was looking down on him. Elamin was much more confident about her description of the multi-colored jacket worn by the man who fled the building and her assertion, after viewing the surveillance video, that it resembled one that Jackson owned. It was for the jury to determine whether, or to what extent, Elamin's testimony was credible. The State's use of Elamin's testimony about the physical characteristics of the person she saw running from her building did not constitute prosecutorial misconduct.

**[\*P95]** With respect to closing argument, Jackson contends that the State improperly commented in its rebuttal closing argument that Horn's prior statements were evidence "to be used to prove the identity of the shooter." The prosecutor did not make such an

explicit statement. In the section cited by Jackson, the prosecutor responded to a defense argument about Horn's credibility; specifically, the defense argued that Horn's statement on the 911 call that he did not know the shooter and his later inconsistent statements identifying Jackson as the shooter rendered Horn's testimony unreliable or that, in the alternative, the jury should believe Horn's statements that he did not know the shooter. The State's argument focused on the role fear could have played in Horn's actions and on his reluctance to identify Jackson. There was nothing improper about this argument.

[*P96] Jackson's final argument relates to Sims's testimony that he (Sims) received a call in the early morning on March 20, 2010, which made him concerned that his gun had been used in a shooting. The prosecutor stated in her rebuttal closing argument: "[Defense counsel] said [in closing argument] you didn't hear anything about — anything about details of that [conversation] * * *. And you know why? Defense counsel objected, objected to that part." This was improper argument. It suggested that there was something in the conversation between Sims and the caller that would have prejudiced Jackson and that was kept from the jury by Jackson's objection.

[*P97] Defense counsel objected to the prosecutor's statement, the objection was discussed at sidebar, and the objection was sustained. When the prosecutor continued her closing argument, she merely stated that "the things that might have been talked about" during this phone call were "pure speculation." The trial court later instructed the jury that it should not speculate as to the court's reason for sustaining an objection. In our view, there is no possibility that this comment affected the outcome of the trial.

[*P98] The eleventh assignment of error is overruled.

*State v. Jackson, supra.*

In *Serra v. Michigan Dept of Corrections*, 4 F.3d 1348 (6th Cir. 1993), the court

identified factors to be weighed in considering prosecutorial misconduct:

In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.* at 1355-56, *quoting Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982)(citation omitted). The misconduct must be so gross as probably to prejudice the defendant. *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.), *cert. denied*, 522 U.S. 1001 (1997)(citation omitted); *United States v. Ashworth*, 836 F.2d 260, 267 (6th Cir. 1988).  Claims of prosecutorial misconduct are reviewed deferentially on habeas review.  *Thompkins v. Berghuis,* 547 F.3d 572 (6th Cir. 2008), rev'd on other grounds, 560 U.S. 370 (2010), *citing Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004), *cert. denied,* 544 U.S. 921 (2005).

The Sixth Circuit has recently re-articulated the relevant standard for habeas claims of prosecutorial misconduct as follows:

> On habeas review, claims of prosecutorial misconduct are reviewed deferentially.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* (citation omitted).  Even if the prosecutor's conduct was improper or even "universally condemned," *id.*, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair.  Once we find that a statement is improper, four factors are considered in determining whether the impropriety is flagrant:  (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial.  *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).  Under [the] AEDPA, this bar is heightened by the deference we give to the . . . [Ohio] Supreme Court's determination of . . . [Petitioner's] prosecutorial-misconduct claims.  *See Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002)("If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated Macias's due process rights.  But this case is before us on a petition for a writ of habeas corpus.  So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law.").

*Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003).

> The relevant question in analyzing a claim for prosecutorial misconduct on habeas review is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (internal quotation marks omitted). To satisfy this standard, the conduct must be both improper and flagrant. *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006); *see also Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (noting that reversal is required if the prosecutor's misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant") (internal citation omitted). If conduct is found to be improper, four factors are then considered to determine whether the conduct was flagrant and therefore warrants reversal: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

*Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008).

The Second District's decision of Jackson's Tenth Assignment of Error is in no way contrary to or an unreasonable application of Supreme Court precedent as to prosecutorial misconduct. Nor does it even begin to show that the prosecutor knew Horn was lying. The Third and Eleventh Grounds for Relief should therefore be dismissed with prejudice.

**Ground Seven:  Speedy Trial**

In his Seventh Ground for Relief, Jackson asserts he was denied his federal constitutional

right to a speedy trial.

Respondent asserts this claim is procedurally defaulted by Jackson's failure to present it to the state courts as a federal constitutional claim, but instead presented it as a state law claim. (Return of Writ, Doc. No.7, PageID 1934-36.)  When one examines Jackson's Brief on direct appeal, it bears out the Warden's claim.  The argument appears at PageID 159-61 and is argued solely in terms of Ohio's speedy trial statute, Ohio Revised Code § 2945.71, et seq.  The Sixth Amendment is not mentioned and the argument is made entirely by counting the days Jackson was incarcerated and comparing them with the statutory time limits in Ohio Revised Code § 2945.71.

To preserve a federal constitutional claim for presentation in habeas corpus, the claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim.  *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), overruled in part on other grounds by *Thompson v. Keohane,* 516 U.S. 99 (1995); *Riggins v. McMackin,* 935 F.2d 790, 792 (6th Cir. 1991). The claim must be fairly presented at every stage of the state appellate process. *Wagner v. Smith,* 581 F.3d 410, 418 (6th Cir. 2009).

The standard for compliance with Ohio's speedy trial statute is very strict and different from the federal standard.  The Supreme Court has developed a four-part balancing test to use in determining whether a defendant's Sixth Amendment right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant has asserted his right; and (4) prejudice to the defendant.  *Barker v. Wingo,* 407 U.S. 514, 530-32 (1972). Delay is presumptively prejudicial where the post-accusation delay approaches one year.

*Doggett v. United States*, 505 U.S. 647 (1992).  In contrast, under Ohio law, what counts is the number of days a case is pending and whether the time is tolled by any rather specific events. The Second District certainly did not understand that it was being presented with a constitutional claim.  It decided Jackson's speedy trial claim as it was presented – strictly on statutory grounds. *See State v. Jackson, supra*, ¶¶ 30-32.   Ground Seven should therefore be dismissed with prejudice as procedurally defaulted for lack of fair presentation.

**Ground Nine:  Ineffective Assistance of Counsel**

In his Ninth Ground for Relief, Jackson asserts he received ineffective assistance of trial counsel in the various aspects outlined above.  This was his Ninth Assignment of Error on direct appeal which the Second District decided as follows:

> [*P99] Jackson's ninth assignment of error states:
>
> APPELLANT'S CONVICTION MUST BE REVERSED DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.
>
> [*P100] Jackson contends that, in numerous instances, his attorney did not object to the admission of improper evidence or to prosecutorial misconduct, and that these instances deprived him of a fair trial. Jackson has not presented an argument as to how counsel's response to each of the listed comments was unreasonable or affected the outcome of the trial; he has simply provided a list of statements or questions to which, he believes, counsel should have objected. Such an argument does not comport with App.R. 16(A)(7). Nonetheless, we will briefly address these statements.
>
> [*P101] We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)*, and adopted by the Supreme Court of Ohio in *State v. Bradley, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989)*. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance.

*Strickland,* 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook,* 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

**[\*P102]** Jackson argues that his attorney was ineffective in failing to object to Detective Pigman's hearsay testimony that Horn had identified Jackson in a photo array, that Sims had identified Jackson in a photo array, and that Paula Papke was the custodian of the Cincinnati Bell records. Insofar as Horn, Sims, and Papke confirmed these facts in their own testimonies, there is no reasonable probability that the outcome of the trial would have been different but for Pigman's statements.

**[\*P103]** Jackson also claims that counsel should have objected to Pigman's testimony that, in a cell phone call with Jackson that was conducted in Pigman's presence and recorded by Pigman, Sims told Jackson — at Pigman's prompting — that Sims needed his gun back. Pigman did not testify about Jackson's response, if any, to this statement. Sims testified that he did not get his gun back from Jackson. In our view, this statement by Sims (as recounted by Pigman) was not hearsay because it was not offered for the truth of the matter asserted. Moreover, because Jackson's response to the statement was not revealed, Jackson suffered no prejudice as a result of this testimony.

**[\*P104]** Jackson also contends that counsel should have objected to Papke's testimony, because she did not "properly authenticate her [Cincinnati Bell] records as business records." We addressed the authentication of these records under the eighth assignment of error, and we do not believe that an objection by counsel would have led to the exclusion of the records or otherwise affected the outcome of the trial.

**[\*P105]** Pigman's statement that he verified Sims's ownership of the murder weapon through an ATF agent was of no consequence to Jackson, as there was no dispute as to the ownership of the gun. Thus, counsel's failure to object to this statement was not ineffective.

**[*P106]** Jackson claims that his attorney was ineffective in failing to object to Pigman's testimony about the Cincinnati Bell phone records. Specifically, Pigman testified about his efforts to verify phone calls Jackson claimed to have made related to his alibi (for example, calling a friend for a ride to Kettering in the late afternoon of March 19, 2010) and the location of the cell phone on March 19 and 20, 2010. Jackson claims that counsel should have objected to Pigman's testimony about what he learned from the phone records, although he does not suggest on what basis such an objection should have been made. Our review of the record reveals that counsel did object several times to Pigman's testimony about the phone records, but these objections were overruled. Counsel was not ineffective in failing to object.

**[*P107]** Jackson's last argument about ineffectiveness related to Pigman's trial testimony is that Pigman stated, with respect to his third interview with Horn, that none of the information provided by Horn "changed from what [Horn] had said in the previous two interviews." Counsel did not object to this statement. Again, Jackson has not stated on what basis an objection should have been made, and it is not apparent that this statement was harmful to Jackson's case. We cannot conclude that counsel was ineffective in failing to object to this statement or that the outcome of the trial likely would have been different if counsel had objected.

**[*P108]** Jackson's remaining arguments allege ineffective assistance in counsel's failure to object to the State's questioning of Horn during his deposition about (1) Horn's prior inconsistent statements to prosecutors, (2) Horn's fear of testifying against Jackson, (3) his failure to appear in court on previous occasions, and (4) the State's impeachment of Horn's "credibility" about the identity of the shooter. Jackson also suggests that defense counsel should have impeached Horn at the deposition with his prior testimony at the suppression hearing, wherein Horn stated that he did not know if the shooter was wearing a mask.

**[*P109]** Both the State and defense counsel were in difficult positions in handling Horn's testimony, because they sought to persuade the jury of the credibility of some of Horn's statements about the identify [sic] of the shooter, while discrediting or explaining other inconsistent statements. Under such circumstances, we have held that the failure to object is within the realm of reasonable trial tactics and, therefore, does not definitively establish deficient performance by counsel. *State v. Risden*, 2d Dist. Montgomery No. 22930, 2010 Ohio 991, ¶ 179,

citing *State v. Gray,* 2d Dist Montgomery No. 20980, 2007 Ohio 4549. Further, we can only speculate as to whether further questioning or lodging of objections during Horn's testimony would have bolstered or diminished the parts of his testimony upon which Jackson sought to rely. As such, we find no ineffective assistance in trial counsel's handling of Horn's deposition testimony.

**[\*P110]** Jackson's ninth assignment of error is overruled.

*State v. Jackson, supra.*

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987).  *See generally* Annotation, 26 ALR Fed 218.  "The likelihood of a different result must be substantial, not just conceivable."  *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *cert. denied,* ___ U.S. ___, 132 S.Ct. 1760 (2012), *quoting Harrington v. Richter*, 562 U.S. ___, ___, 131 S. Ct. 770, 792 (2011).

The Second District plainly applied the correct federal standard, to wit, that adopted in *Strickland v. Washington*, *supra*. Jackson has failed to demonstrate that the state's court's application was incorrect in any way, much less objectively unreasonable.  Both prongs are mixed questions of law and fact and are therefore reviewed under the AEDPA's "unreasonable application" prong.  *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

> When evaluated under § 2254(d), a court's review of a *Strickland* claim is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009). The state court's own *Strickland* analysis must receive the benefit of the doubt, and "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788, 178 L. Ed. 2d 624 (2011).

*Washington v. McQuiggin*, 2013 U.S. App. LEXIS 14165 (6th Cir. 2013).  This Court should defer to the Second District's decision and dismiss and Ninth Ground for Relief with prejudice.

30

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous.

March 25, 2014.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).