# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

DENNIS D. JACKSON,

               Petitioner,            :     Case No. 3:13-cv-347

     - vs -                        District Judge Thomas M. Rose
                                 Magistrate Judge Michael R. Merz

WARDEN, Lebanon Correctional
  Institution,

                               :

              Respondent.

===

## SUPPLEMENTAL REPORT AND RECOMMENDATIONS

===

This habeas corpus case is before the Court on Petitioner's Objections (Doc. No. 14) to the Magistrate Judge's Report and Recommendations (the "Report," Doc. No. 10). Judge Rose has recommitted the case for reconsideration in light of the Objections (Recommittal Order, Doc. No. 16). On the same day he filed his Objections, Jackson also moved to expand the record (Doc. No. 13), a motion the Warden opposes (Doc. No. 17) and on which Jackson has filed a Reply in support (Doc. No. 18).

**Motions to Expand the Record**

In his First Motion to Expand the Record (Doc. No. 8), which was denied as part of the Report, Jackson sought to add the following documents:

Exhibit A[1] Trotwood Police Incident Report on March 19, 2010, of an assault on

---

[1] Although Jackson identifies the exhibits in his Motion, he has not labeled them as they are attached to the Motion.

Shevonda Leslie by Antione West with attachments (PageID 1985-89).

Exhibit B Trotwood Police Report by Officer Troy Dexter regarding a March 20, 2010, interviews with Brandon Harris and Phil Benson (PageID 1990-91).

Exhibit C) Trotwood Police Report by Officer David Yaney dated March 21, 2010, of a conversation with a confidential informant (PageID 1992).

Exhibit D Trotwood Police Report by Officer Michael Pigman dated March 23, 2010, of conversations with Thomas Horn (PageID 1993).

Exhibit E March 20, 2010, written statement of Thomas Horn (PageID 1994).

Exhibit F Trotwood Police Report by Officer Troy Dexter dated March 22, 2010, concerning statements made by Donna Hayden, the victim's mother (PageID 1995-96).

Exhibit G Trotwood Police Report by Officer Michael Richardson dated March 22, 2010, regarding March 18, 2010, call to 4360 Nevada regarding the domestic disturbance between Shevonda Leslie and Antione West (PageID 1997).

Exhibit H Trotwood Police Report by Officer Michael Pigman dated March 22, 2010, regarding attempts to locate Brandon Harris and an eventual interview with him (PageID 1998-2000).

Exhibit I Trotwood Police Report date March 27, 2010, by Officer Thomas Quigley relating additional information from the domestic violence call on March 19, 2010.

In his Second Motion to Expand the Record (Doc. No. 13), Jackson seeks to add the following documents to the record:

Exhibit J - Docket of the Montgomery County Common Pleas Court in State v. Jackson, Case No. 2010-CR-01126 (PageID 2061-72).

Exhibit K - Page 6 of a 7-page Trotwood Police Report by Police Officer Henry L. Crist dated April 2, 2010, regarding the underlying offense in this case ( PageID 2073).

Exhibit L - Page 5 of the same report ( PageID 2074).

Exhibit M - An email exchange between Trotwood Detective Mike Pigman and Brandon Henderson on March 26, 2010  ( PageID 2075).

Exhibit N - Pages 1 and 2 of a 3-page report of the Miami Valley Crime Laboratory to Detective Mike Pigman dated May 6, 2010 (PageID 2076).

Jackson argues that these documents show his actual innocence and a *Brady* violation in this case (Motion, Doc. No. 13, PageID 2059).  The Warden opposes the Motion on the grounds consideration of these documents is precluded by *Cullen v. Pinholster,* 563 U.S. ___, 131 S. Ct. 1388 (2011), and in any event they are not sufficient new evidence of actual innocence to satisfy the "gateway" innocence standard of *Schlup v. Delo*, 513 U.S. 298, 316 (1995).  Because the ruling on the First Motion to Expand was made as part of the Report and the Report has now been recommitted, the Magistrate Judge considers all of these tendered exhibits together.

In his Reply, Jackson argues first that *Pinholster* does not preclude an evidentiary hearing on whether a petitioner has met the *Schlup* standard (Reply, Doc. No. 18, PageID 2141).  The Court agrees; *Pinholster* only applies to the determination of whether the state court judgment is contrary to or an unreasonable application of clearly established Supreme Court precedent.

Jackson next argues that *Pinholster* does not limit a habeas court's authority under 28 U.S.C. § 2254(a) to release a prisoner being held in violation of the Constitution.  Actually, a federal court's power to grant the writ is conferred by 28 U.S.C. § 2241.  Section 2254(a) limits that power in cases where a person is confined on judgment of a state court to custody that is unconstitutional; the balance of § 2254 provides further procedural limitations on that power.  In other words, § 2254(a) does not create authority to decide state prisoner habeas cases on evidence not before the court pursuant to all of § 2254.

*Detrich v. Ryan*, 677 F.3d 958 (9th Cir. 2012), cited by Jackson in his Motion at PageID 2142, is not to the contrary.[2]  It allows a federal evidentiary hearing on the prejudice prong of the cause and prejudice test for excusing procedural default.  But that is not at issue with any of the

---

[2] Note that this cited decision of the Ninth Circuit panel was vacated when the Ninth Circuit granted en banc review. *Detrich v. Ryan*, 696 F.3d 1265 (9th Cir. 2012).  The panel opinion therefore no longer has precedential effect even in the Ninth Circuit.

exhibits Jackson seeks to add.

Jackson further argues, in opposition to the Warden's position, that his tendered exhibits are "new" within the meaning of *Souter v. Jones*, 395 F.3d 577, 596, n.9 (6th Cir. 2005): evidence not seen by the jury at trial. The Court agrees with that reading of *Souter*. However, while these exhibits may be new in that sense, there is still a question whether Jackson's delay in presenting them is justified. The Supreme Court held in *McQuiggin v. Perkins*, 569 U.S. ___, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013):

> [A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S., at 329, 115 S. Ct. 851, 130 L. Ed. 2d 808; see *House*, 547 U.S., at 538, 126 S. Ct. 2064, 165 L. Ed. 2d. 1 (emphasizing that the *Schlup* standard is "demanding" and seldom met). And in making an assessment of the kind *Schlup* envisioned, "the timing of the [petition]" is a factor bearing on the "reliability of th[e] evidence" purporting to show actual innocence. *Schlup*, 513 U.S., at 332, 115 S. Ct. 851, 130 L. Ed. 2d. 808.
>
> * * *
>
> [A] federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown.

133 S. Ct. at 1928, 185 L. Ed. 2d at 1027.

The Warden argues that Jackson has not shown the tendered documents are part of the state court record. Respondent is incorrect as to Exhibit J. With the exception of the handwritten notations on this exhibit, which are minimal and which the Court will ignore, Exhibit J is the genuine docket of the Montgomery County Clerk of Courts on this case, at least

through the date on which it shows it was generated by the Clerk's online system, August 10, 2011 (available at www.clerk.co.montgomery.oh.us/pro).

As to the remaining tendered exhibits, while they were not part of the record  before the jury, they appear to be authentic official documents and they are within the description of documents permitted to be used to expand the record under Rule 7(a) of the Rules Governing § 2254 Cases.  Under *Pinholster*, they cannot be considered in deciding the question presented by 28 U.S.C. § 2254(d)(1), but the Court can consider them in determining whether Jackson has met the *Schlup* gateway innocence standard.[3]  Therefore, as to all of the tendered exhibits, both Motions to Expand the Record for that limited purpose are GRANTED.

**Jackson's Claim of Actual Innocence**

The question before the Court is whether the tendered exhibits, when considered with the record that was before the jury, satisfy the *Schlup* standard, reiterated in *Souter, supra:*

> [I]f a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."  *Schlup v. Delo*, 513 U.S. 298, 316 (1995)." Thus, the threshold inquiry is whether "new facts raise[] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence --

---

[3] Although Jackson claims the documents show a *Brady* violation, none of his eleven grounds for relief pleads a *Brady* violation.

> whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321.

*Id.* at 590.

Jackson argues that these exhibits satisfy the *Schlup* standard as follows:

> Petitioner contends that these exhibits not only show a misidentification of your petitioner, but also show that there was another suspect interviewed by detectives wearing the exact same clothing prosecutors attempted to dress your petitioner in, owning a gold car and identified to detectives by Thomas Horn. Petitioner claims he was prejudiced because clothes, and car of this other suspect that matched the person seen fleeing from the scene of the crime was never tested for DNA.

(Objections, Doc. No. 14, PageID 2151-52.)  Jackson gives the Court no reference to which exhibits purportedly show these facts.

> Petitioner also argues that these reports raise a serious question [as] to the accuracy of Det. Pigman's testimony that Horn did not know Brandon Harris and had actually told Pigman such thing. (See Doc. # 6-6, PageID 73 of 152, PageID 824 (Det. Pigman's testimony) and to Horn's credibility.

*Id.*  at PageID 2152.  Docket No. 6-6, at PageID 73 is Tom Horn's motion to be allowed to testify by deposition.  The provided citation of PageID 152 is page 12 of Jackson's Brief on Appeal.  PageID 824 is part of detective Pigman's testimony at the motion to suppress hearing held July 7, 2010.  Two of these places contain no testimony of Pigman at all and the third location says nothing about Brandon Harris, but rather that Horn told Pigman he recognized the shooter, not that the shooter was Brandon Harris.

> Petitioner also asks this Court to grant the most recent motion to supplement the record with DNA report further showing your petitioner's actual innocence dated May 23, 2014.

(Objections, Doc. No. 14, PageID 2153.)  The referenced DNA report shows that there was a

6

mixed DNA profile on a swab of the watch with the broken band or buckle found at the scene and the victim, Antione West, is excluded as a contributor.

Police Officer Henry Crist found that watch at the crime scene.  Exhibit L is page five of Officer Crist's report that shows he recovered the watch from the floor at the crime scene (See Motion, Doc. No. 13-3, Ex. L at PageID 2074).  Exhibit K is page six of that report and includes Crist's hypothesis that the watch was torn from the victim's arm during the struggle which ended in his death and the band was broken at that time (Motion, Doc. No. 13-2, Ex. K at PageID 2073).  Jackson claims Crist's report could have been used to cross-examine him at trial and show that he had "falsely reported such watch was torn from victims[4] during struggle." (Objections, Doc. No. 14, PageID 2156.)

Crist testified at trial that he is a Trotwood Police Officer with duties of road patrol and as an evidence technician. (Trial Tr. Doc. No. 6-7, PageID 1097-98.)  He arrived at the crime scene, Unit 4716 at 716 Kelford Place in Trotwood, at about 12:55 A.M., on March 20, 2010. The responding officers were Officers Davis and Douglas whom he contacted when he first arrived. *Id.* at PageID 1101.  There was only one door to the crime scene apartment which was neither locked nor damaged. *Id.* at PageID 1105.  Officer Crist did not testify at trial at all about the watch.

Exhibit M purports to be an email exchange between Brandon Henderson and Detective Pigman on March 26, 2010 (Motion, Doc. No. 13-4, Ex. M, PageID 2075).  In his response to Pigman's email, Henderson states the victim, Antione West, is his cousin and Thomas Horn is his brother.  Henderson claims he sold West his watch the same day West was killed.  Jackson asserts this proves Henderson was at the crime scene and dropped his watch, but needed to exculpate himself by explaining to Pigman why his watch was there (Objections, Doc. No. 14,

---

[4] Jackson used the plural.

PageID 2157).   Jackson notes that testimony from the DNA analyst excluded him as a contributor to the DNA on the watch. (Objections, Doc. No. 14, PageID 2157, citing Trial Tr., Doc. No. 6-9, PageID 1437-38.)

Henderson also states in the email that he had a conversation with Shevonda Leslie, the mother of one or more children of the victim, the day before the shooting in which she "said to us yall should beat him up 4 me, but she and us was all playing around because they [Leslie and West] go through [sic] this all the time." (Motion, Doc. No. 13-4, Ex. M, PageID 2075.) Henderson's statement about Leslie and West "getting into it a lot that week" is corroborated by Exhibit A, the police report of Leslie's complaint of domestic violence against West on March 19, 2010 (Motion, Doc. No. 8-1, Ex. A, PageID 1985-89).

Jackson claims this email shows Pigman perjured himself at trial when he says "His [Henderson's] name was never mentioned being at the apartment to me.  Q. That night?  A. That night, yes."  (Objections, Doc. No. 14, PageID 2156, quoting Trial Tr. Doc. No. 6-10, PageID 1730-31.)  This does not at all prove Pigman was perjuring himself.  Henderson does not claim in the email that he was present during the shooting.  Instead, he tells Pigman he came to 716 Kelford after he had been told his brother was shot.  He does not say he identified himself to the police.  Of course, both his brother (Horn) and his cousin (West) were there and it was the cousin, not the brother who was shot.

Defense counsel also asked Detective Pigman if cell phone records showed Henderson was in the area that night and Pigman responded that he had no "intel" about Mr. Henderson. Given the question that was asked, the answer should be read as saying that Pigman did not have any cell phone intelligence about Henderson.   Earlier in the cross-examination he admitted having Henderson's name in connection with the investigation.

Jackson's theory apparently is that Henderson is the one who shot his cousin, Antione West, and that his email to Pigman, properly read, inculpates Henderson while Henderson is trying to exculpate himself.  There is of course no testimony from Henderson and Pigman understood he was in Michigan and not coming back, so he could not be interviewed further. Jackson gives no account of how he came into possession of the email exchange between Pigman and Henderson.

Exhibit B is a report of Trotwood Police Officer Troy Dexter of his interviews with Brandon Harris and Phil Benson on the morning after the murder.  Harris admitted being intimate with Leslie (Motion, Doc. No. 8-2, Ex. B, PageID 1990-91).  Benson reported he was with Harris shortly after midnight when he got a phone call from Leslie reporting that West (identified in the report as Shevonda's baby's daddy) got shot.  Assuming the truth of the contents of this report, it does nothing to exculpate Jackson.

Exhibit C is an Incident Report of a conversation between Trotwood Police Officer Yaney and an unnamed informant (allegedly one of west's best friends) on the morning of March 21, 2010, that the informant had heard from an unidentified third party that Leslie had admitted to another unidentified person that she set West up for a robbery of his drugs by Horn and Harris (Motion, Doc. No. 8-3, Ex. C, PageID 1992).  This is of course at least triple hearsay. The unidentified third party could probably have testified to Leslie's admission because it was against her penal interest, but there is no way of assessing that third party's reliability.

Exhibit D reports conflicting statements by Thomas Horn to Detective Pigman, first that he could identify the shooter and it was Brandon Harris, then that it was an unidentified male who used to date Horn's cousin Brenda Harris (Motion, Doc. No. 8-4, Ex. D, PageID 1993). Between those two statements, Horn failed to pick Harris out of a photo array that included his

picture.

Exhibit E is a handwritten statement of Thomas Horn on March 20, 2010. He recounts the shooting incident but says nothing that exculpates Jackson (Motion, Doc. No. 8-5, Ex. E, PageID 1994).

Exhibit F is Trotwood Police Officer Troy Dexter's March 22, 2010, Report of his interview with Donna Hayden, West's mother, around 2:00 A.M. on March 20, 2010 (Motion, Doc. No. 8-6, Ex. F, PageID 1995-96). She knew of the domestic dispute between Leslie and West, but did not believe it was connected *Id.* at PageID 1996. Dexter also reports finding the murder weapon.

Exhibit G is a report of police contact with Leslie and West on March 18, 2010, which explains more of the background of the domestic dispute (Motion, Doc. No. 8-7, Ex. G, PageID 1997). It does nothing to exculpate Jackson.

Exhibit H is Detective Pigman's report of March 22, 2010, of his interview with Brandon Harris at around 10:00 a.m. on March 20, 2010 (Motion, Doc. No. 8-8, Ex. H, PageID 1998-2000). He reports that Harris gave a confused account of his whereabouts on March 19-20 in the late evening and early morning. He admitted knowing Leslie, having met her when he got out of prison April 18, 2009, and having had oral sex from her during that evening. He had no visible signs of having been in a struggle. When the interview was over, several people had appeared to provide alibi statements for him.

Exhibit I is an additional report by Officer Quigley about the domestic violence report which, per West's sister Cassey, identifies a "Brandon" as having been at Leslie's residence on March 19, 2010 (Motion, Doc. No. 8-9, Ex. I, PageID 2001).

This "new" evidence as tendered by Jackson must be considered in light of the evidence

actually presented at trial. The Second District Court of Appeals summarized the evidence in

deciding Jackson's fourth and fifth assignments of error on direct appeal. It held

[*P117] The State presented the following evidence at trial:

[*P118] Several witnesses testified that, on the afternoon and evening of March 19, 2010, Antoine[5] West and several of his friends, including Jeremy White, Thomas Horn, and Kimberly Carl, had been "hanging out" together at the Deer Creek apartment complex in Trotwood. White's girlfriend, West's mother, and Carl all lived in separate units of the apartment complex, and the friends spent time in several apartments. West sold marijuana to numerous people throughout the day and was seen with a large amount of cash.

[*P119] Later in the evening, White, Horn, Carl, and West were at West's mother's apartment, Unit 4716. Between 10:00 and 10:30 p.m., White left to return to his girlfriend's apartment. West, Horn, and Carl were watching television in the dark when, according to Carl and Horn, someone opened the apartment door without knocking or using force; the person "came in * * * smooth" and was several steps inside the apartment before he was noticed. He then ordered the occupants to "lay down" and pointed a gun at them. Carl and Horn moved toward the kitchen, where they attempted to conceal or shield themselves under some blankets near the washer and dryer, while West lunged toward the intruder. Carl and Horn heard some "tussling" and some shots fired. Carl and Horn did not hear anyone leave the apartment, so they waited a short time to come out from under the blanket. When they did, they found West, wounded, in the foyer of the apartment, with his pants partially pulled down and the pockets pulled out. They testified that West's pockets had not been pulled out earlier.

[*P120] Horn called 911 on his cell phone from the exterior hallway of the apartment building, but he left before the police arrived. In his 911 call, he claimed not to know the identity of the shooter.

[*P121] A neighbor, Tahira Elamin, and her guest, Alan Webb, were in the unit across the hall from Unit 4716 at the time of the shooting. They hid in a bedroom until the shooting stopped; then Elamin heard "rumbling" down the exterior stairwell and looked out the bedroom window. She saw an African-American man running from the building toward a gold car parked in the lot; the

---

[5] Spelled "Antione" at most places in the record.

man was wearing a multi-colored jacket. When Webb and Elamin opened the door to Elamin's apartment moments later, they saw West in the foyer of the neighboring apartment, bleeding, and observed Horn (and possibly Carl) calling 911.

[*P122] When police officers responded to Unit 4716, they found West seriously wounded and lying in the foyer of the apartment. Carl was present, but Horn was not. The initial EMT responders called for CareFlight, but West was pronounced dead at the scene a short time later. West had been shot in the top of his head, in his chest, and in his left hip and thigh. Shell casings were found in the vicinity of the body and at various places around the main room of the apartment. There was no money in West's pockets at the time of his death.

[*P123] Later that night, a detective found a Springfield Armory .45 caliber gun in a grassy area of the apartment complex; forensic evidence linked the gun to West's shooting.

[*P124] Dion Sims, an acquaintance of Jackson, testified that he was the owner of the Springfield Armory handgun. He further testified that Jackson had asked to borrow the gun on the evening of March 19, 2010, and Sims had given it to him. Sims became concerned early the next morning when a phone call from a friend alerted him to the fact that the gun may have been used in a crime at the Deer Creek Apartments. Sims attempted to go to the apartment complex to look for the gun, but he was deterred by the heavy police presence when he approached. Sims contacted an attorney who helped him arrange a meeting with the police, because he was afraid he would be blamed for the crime. Jackson never returned the gun to Sims.

[*P125] When Horn was identified and located by the police, he initially claimed that he could not identify the shooter. However, he subsequently contacted Detective Pigman and identified Jackson, who was the boyfriend of one of Horn's cousins, as the shooter. Horn also identified Jackson in a photo array prepared by Detective Pigman. Horn indicated to Pigman that he was fearful about testifying against Jackson. Horn gave a deposition after he was arrested on a material witness warrant; in his deposition, which was played at trial, he claimed not to recall having identified a shooter, but acknowledged that he had made prior statements identifying Jackson.

[*P126] When he was interviewed by the police, Jackson claimed that he had been staying with his son's mother, LaKesha Gray, in

Kettering at the time of the shooting. Gray remembered the week well because her sister had died on March 15, and the funeral had taken place on March 20. After the funeral, Jackson had asked her to tell the police that he was with her from March 15 - 20. Gray initially lied to the police for Jackson, but when she learned from one of the detectives that they were investigating a homicide, she admitted that her earlier statement had been untrue. Jackson's cell phone records also indicated that he had been near Trotwood, not in Kettering, at the time of the shooting.

[*P127] Jackson's girlfriend at the time of the shooting told police that she and Jackson had been at a Kroger store on Seibenthaler Avenue around noon on the day of the shooting. Using this information, the police obtained a March 19 surveillance video from the store. In the video, Jackson was wearing a multi-colored jacket. At trial, Elamin was asked whether the jacket in the video resembled the jacket she had seen on the man who ran from her building the night of the shooting; she answered affirmatively.

[*P128] There was no DNA or other forensic evidence linking Jackson to the shooting. Jackson was excluded as the contributor of DNA found in scrapings under one of West's fingernails and in West's pockets.

[*P129] Although much of the evidence against Jackson was circumstantial, circumstantial evidence and direct evidence are of equal value, especially because some facts can only be proved by circumstantial evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991). The State's evidence, if believed by the jury, would convince the average mind of the defendant's guilt beyond a reasonable doubt. Thus, Jackson's conviction was not supported by insufficient evidence. Further, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice by weighing the evidence as it did. Accordingly, Jackson's conviction was not against the manifest weight of the evidence.

[*P130] The fourth and fifth assignments of error are overruled.

*State v. Jackson*, 2012-Ohio-2335, 2012 Ohio App. LEXIS 2057 (2nd Dist. May 25, 2012).

The "new" evidence does not undermine this Court's confidence in the outcome of the

trial.  First of all, none of it is "exculpatory scientific evidence,[6] trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324.  It is not at all like the persuasive eyewitness testimony in *Schlup* or the new forensic evidence in *House v. Bell*, 547 U.S. 518 (2006). Secondly, all of this material was available at the time of trial and all of the police reports could have been obtained by Jackson's counsel, if they were not furnished in discovery, by a public records request.  Jackson makes many arguments about suppression of evidence by the State, but there is no *Brady* claim in the Petition and Jackson presents nothing from his trial counsel to support his claim these materials were not turned over. While evidence need not be "newly discovered" to be admissible on an actual innocence claim, the Supreme Court emphasized in *McQuiggin, supra,* that the failure to present the evidence earlier counts against its credibility.  The law has a strong preference for presenting the available evidence to one jury at one time.  Failure to present evidence that was reasonably available forces a habeas court to speculate what a jury would have made of the evidence instead of finding out in the first instance what they made of it.

In addition to the weakness of the newly tendered evidence in itself, it does nothing to undermine the strong evidence against Jackson.  In particular, it does nothing to rebut the testimony of Dion Sims that he loaned the firearm shown to be the murder weapon to Jackson several hours before the murder and that after the murder Jackson offered to pay for it instead of returning it.  Jackson had the murder weapon when the murder happened, having acquired it the same day and having disposed of it the next morning.

Secondly, the newly tendered evidence does nothing to explain Jackson's suborning a perjured alibi from his girlfriend.

---

[6] The lack of Jackson's DNA on the watch was not presented at trial, but it would have been merely cumulative to the DNA analyst's testimony that Jackson's DNA also was not found in fingernail scrapings from West's body.

Admittedly, the newly-tendered evidence further undermines the credibility of Thomas Horn.  However, trial counsel made extensive use of other material to attack Horn's credibility with the jury and ultimately it was for the jury to decide if he was credible or not.

Jackson has not shown he is entitled to pass through the actual innocence gateway recognized in *Schlup*.

**Supplemental Report on Individual Grounds for Relief**

In the Report, the Court analyzed Grounds One, Four, Five, Six, and Ten together as presenting one undefaulted claim under *Jackson v. Virginia*, 443 U.S. 307 (1979), that his conviction was supported by insufficient evidence (Report, Doc. No. 10, PageID 2028).  Jackson objects and contends the Grounds for Relief must be read and analyzed separately.  In this Supplemental Report, the Court proceeds on that basis.

**Ground One**

The First Ground for Relief as pled in the Petition is:

> **GROUND ONE:** The State's own witnesses, on the day of the crime informed police officers that the person responsible was wearing a "Dark" or "Black" jacket or hoodie, yet even though the Kroger video proved Petitioner was wearing a multiple colors and design jacket, and the fact that no forensic evidence connects him to the crime, and the fact that he is actually innocent.

(Petition, Doc. No. 1, PageID 8.)

In his Objections, Jackson states this is not a claim of insufficient evidence but, as

supplemented by the Reply,[7] is actually a claim that his due process rights were violated "when the trial court allowed an unfair duly [sic] suggestive and unreliable photo array to be used at trial." (Objections, Doc. No. 14, PageID 2148.) The Reply cites the quoted language as appearing at Return of Writ at Doc. No. 6-2, PageID 381 which is part of Jackson's *pro se* statement in support of jurisdiction in the Ohio Supreme Court.

The Respondent's objection that Ground One as set forth in the Petition does not state a cognizable claim under the Constitution and it is also true that a habeas petition cannot "amend" his petition by incorporating by reference language from his appeal to the Ohio Supreme Court.

Rather than decide this claim on a pleading basis, however, the Court notes Jackson raised this claim as his first assignment of error on direct appeal. The Second District Court of Appeals decided that assignment as follows:

> **[*P34]** Jackson's first assignment of error states:
>
> THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS THE PHOTO-SPREAD IDENTIFICATION BY THOMAS HORN AS SAID IDENTIFICATION WAS UNDULY SUGGESTIVE AND UNRELIABLE.
>
> **[*P35]** Jackson claims that the trial court erred in admitting evidence that, using photo arrays presented by Trotwood detectives, Thomas Horn had identified Jackson as the shooter and Dion Sims had identified Jackson as the person to whom Sims loaned the murder weapon. Jackson claims that the detective who presented the photo arrays to these witnesses had indicated that a suspect was part of each photo array, which rendered the identification procedure unduly suggestive.
>
> **[*P36]** "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *State v. Marshall* 2d Dist.

---

[7] This document, a habeas petitioner's response to the return of writ, is properly called a "reply" which is what Jackson captioned it. He sometimes refers to it as a "traverse" and it fulfills the same function as the traverse did in older habeas cases. The terms are used interchangeably.

Montgomery No. 19920, 2004 Ohio 778, ¶ 11, citing *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). "To warrant the suppression of identification testimony, the accused bears the burden of showing that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances." *State v. Poindexter*, 2d Dist. Montgomery No. 21036, 2007 Ohio 3461, ¶ 11, citing *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Biggers; State v. Broom*, 40 Ohio St.3d 277, 284, 533 N.E.2d 682 (1988). When the trial court's ruling on a motion to suppress is supported by competent, credible evidence, an appellate court may not disturb that ruling. *Poindexter* at ¶ 10, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist. 1994).

**[*P37]** At the suppression hearing, Detective Michael Pigman of the Trotwood Police Department, who was the lead detective in West's murder, testified for the State. Pigman testified that, after Jackson became a suspect in the case, Pigman used a computer program to assemble a photo array that included pictures of Jackson and five other individuals with similar physical characteristics, who were chosen at random. Pigman created multiple versions, such that Jackson's picture was not in the same position on each array. He then showed one photo array to each of the three witnesses connected with the crime: Thomas Horn, Dion Sims, and Kimberly Carl.

**[*P38]** Pigman testified that, before showing the photo array to each witness, he read the photo array identification instructions while the pictures were covered and informed each witness that the spread "may or may not contain a picture of the person who committed the crime" being investigated. Pigman testified that he did not do anything to suggest that a suspect was depicted in the array.

**[*P39]** According to Pigman, Sims and Horn each identified Jackson from the photo array presented to him; Horn said that Jackson was the man involved in the shooting, and Sims stated that Jackson was the man to whom he had loaned his gun the night of March 19, 2010. (The three men knew one another prior to the shooting through their families.) Carl was not able to identify anyone in the photo array.

**[*P40]** Sims and Horn also testified at the suppression hearing. Sims's testimony corroborated Pigman's testimony that Sims had

been instructed about the identification procedure before he was shown the photos and that Pigman had not indicated that a suspect was contained in the array or which person was the suspect.

[*P41] Horn similarly testified that Pigman had not made any statements to him prior to showing him the photo array which pressured him to make an identification or told him whom to pick. Horn admitted that he had known Jackson before the shooting, but had not initially identified Jackson to Detective Pigman as the shooter because he (Horn) was scared.

[*P42] Jackson did not call any witnesses at the suppression hearing.

[*P43] The trial court found the testimony of Pigman, Sims, and Horn "credible and believable" with respect to whether the witnesses were properly instructed about the photographic line-up; it also found that they had not been told that a suspect was included in the photo array. The court concluded that the photo arrays shown to Sims and Horn (which depicted Jackson in different positions) did not make Jackson's photo stand out and were not otherwise suggestive. The trial court refused to suppress the testimony or exhibits related to the photographic line-up.

[*P44] The trial court reasonably concluded that Detective Pigman's manner of conducting the photo identifications was not improper, unduly suggestive, or likely to give rise to irreparable misidentification. Accordingly, we will not disturb the trial court's refusal to suppress these identifications.

[*P45] The first assignment of error is overruled.

*State v. Jackson, supra.*

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter,* 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone,* 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

Jackson argues Ground One at PageID 2154-58 of his Objections, but much of this argument is devoted to the actual innocence claim.  On the identification claim, he notes that Horn admitted he was very intoxicated during the shooting and this was confirmed by another eyewitness, Jeremy White (Objections, Doc. No. 14, PageID 2154).  Nothing in this section of the Objections shows or even argues that the photo arrays were unduly suggestive.  The fact that Horn was admittedly very intoxicated, which the jury heard, undermines his credibility in picking Jackson out in the photo array, but it does not prove the array itself was unduly suggestive.

The Second District properly cited the applicable Supreme Court precedent, *Neil v. Biggers, supra,* and *Manson v. Brathwaite, supra.*  Jackson merely asserts the application is unreasonable without saying why.  The Court finds the Second District's conclusion on this Ground for Relief is neither contrary to nor an objectively unreasonable application of the relevant Supreme Court precedent.

**Ground Two:  Double Jeopardy**

Ground Two as pled in the Petition states:

> **GROUND TWO**: The State's case against Petitioner was the product of the prosecutor's intent to obtain a conviction at any costs, guilt or innocence meant nothing once the State placed their evil eye on your Petitioner guilt or innocence did not matter, by any means necessary a conviction would be had.

(Petition, Doc. No. 1, PageID 9.)

Respondent argues this claim as pled does not state a claim for relief under the United States Constitution (Return of Writ, Doc. No. 7, PageID 1932).  In his Reply, Jackson asserts that

he has pled a claim of selective prosecution (Reply, Doc. No. 9, PageID 2005-06, *citing Yick Wo v. Hopkins*, 118 U.S. 356 (1886).  On its face, Ground Two says nothing about selective prosecution.

In his Reply Jackson accuses the State of taking "it upon itself to overlook or just out right attempt to omit [sic] the Petitioner's claim of Double Jeopardy."  *Id.*  at PageID 2006. However, one combs the Petition in vain for any mention of the Double Jeopardy Clause.  It is hardly surprising that, examining the Petition, Respondent did not understand Jackson was making a Double Jeopardy claim.

Jackson has done the same thing on Ground Two that he did on Ground One:  treating his Petition as "amended" by his Traverse.  This is unfair to the State because it does not advise them, in the one pleading they have a right to respond to, of what the actual claim is.

However, rather than decide this claim on the basis of this pleading difficulty, the Court proceeds to consider it on the merits because Jackson did raise a Double Jeopardy claim on direct appeal.  The Second District decided it along with the related speedy trial claim as follows:

> THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO DISMISS ON THE GROUNDS OF DOUBLE JEOPARDY, AFTER THE FIRST TRIAL ENDED IN A MISTRIAL.
>
> THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO DISMISS ON THE GROUND OF SPEEDY TRIAL VIOLATION AFTER APPELLANT'S FIRST TRIAL ENDED IN MISTRIAL.
>
> [*P15] Jackson contends that he should not have been retried after the mistrial and that the charges against him should have been dismissed, because his right not to be placed in double jeopardy and his right to a speedy trial were violated by his retrial.
>
> [*P16] As discussed above, the case was originally set for trial on August 30, 2010. At that time, the State informed the court that it had been unable to locate one of its key witnesses, Thomas Horn, who was present at the time of the shooting. The State asked the

court to continue the trial date and to issue a material witness warrant for Horn. The court inquired of the prosecutor how the State would proceed if Horn were not located, and the State indicated that it would proceed without him.[Footnote omitted.] The court granted the motion for a continuance and issued a material witness warrant the same day. The trial was rescheduled for September 20, 2010.

[*P17] Jackson had not waived his right to a speedy trial. According to Jackson's motion to dismiss, "the speedy trial time for commencing the trial * * * ended the week of September 20, 2010." Our own calculations support this assertion.

[*P18] A second jury trial began on September 20, 2010. The fifth witness called by the State was Dion Sims, the registered owner of the gun used in the shooting. (The defense viewed Sims as a potential suspect in the shooting.)

[*P19] Sims testified that Jackson had asked to borrow Sims's gun at 9:00 or 9:30 p.m. on March 19, 2010. Sims agreed to loan the gun to Jackson, and the men met at Sims's house shortly after 10:00 p.m. Sims gave Jackson the gun at that time.

[*P20] Sims further testified that, in the early morning hours of March 20, 2010, he received a phone call from a friend that caused him to be "a little worried, a little scared" that he might be "blamed for something [he] didn't do" at the Deer Creek apartment complex. Sims drove to the vicinity of the apartment complex twice during the early morning hours of March 20 to "see if anything had happened" and to "see if [he] could find [his] gun," but he was deterred from these tasks when he saw "[a] lot of police" there. Sims testified that Jackson never returned the gun.

[*P21] Sims further testified that, at a family gathering on March 20, he learned that his gun had been used in a shooting; in response to receiving this information, Sims "left [his] house and went to a hotel" and contacted an attorney. Sims's testimony on direct examination continued:

Q: * * * At what point did you contact an attorney?

A: It was either Sunday night or Monday morning. I think Monday morning. * * *

Q: Okay. And who was that attorney that you contacted?

21

A: Cynthia Thompson.

* * *

Q: Okay. And how did you have that name?

A: It's my cousin.

Q: * * * And what was the reason that you chose to contact an attorney rather than contacting the police?

A: Because if my gun was used, I didn't want to go talk to the police by myself.

Q: Why not?

A: It was my gun and if they had it, they would have tried to say I did it.

Q: Okay. And did you ask your attorney or do you know whether your attorney contacted the police on your behalf?

A: I believe she did and set up an appointment.

Q: She set up an appointment?

A: Yes.

Q: Okay. Now, at some point, did you switch attorneys?

A: Yes.

Q: Okay. And why did you do that?

A: Because I had taken a lie detector test.

DEFENSE COUNSEL: Objection.

COURT: Sustained.

DEFENSE COUNSEL: Can we approach the bench?

COURT: Yes, yes.

(At sidebar)

22

DEFENSE COUNSEL: Judge, I'm moving for a mistrial right now. I mean it's pretty darn obvious that the only way he would get his story to be believed is to say, "I took a lie detector test." The Jury is going to believe he passed it. And, you know, there's no way — I can't cross-examine him on that.

PROSECUTOR: Judge, I do want the record to be clear that I have met with this witness. We have gone over that we can't talk about that. And I have even —

COURT: Oh, I'm not blaming. No, I —

PROSECUTOR: I just want the record to be clear that I in no way intended to elicit that information.

DEFENSE COUNSEL: Well, he just couldn't resist, I guess, but he did it and it was voluntary.
COURT: Yeah, I think it — I mean, well, I'm going to send the Jury back to the Jury room for a moment and I'm going to think about this for a few minutes, but this seems pretty serious to me, this is not good.


**[\*P22]** The trial court declared a mistrial the next day, concluding that Sims's "credibility [was] certainly going to be a key issue for the jury to decide" and that no curative instruction "would be sufficient to undo that unfair and prejudicial taint" caused by Sims's reference to having taken a lie detector test and the jurors' likely assumption that he had passed it.

**[\*P23]** Jackson filed a motion to dismiss with prejudice. He argued that the mistrial was caused by prosecutorial misconduct. He also argued that the State was "the fortuitous beneficiary of its own actions," because the trial had begun as the speedy trial time expired, the State had gone to trial without locating its material witness, and an "acquittal at trial [was] an inevitable result." Jackson claimed that, through "prosecutorial impropriety" and "overreaching," the State had "'poison[ed] the well' against Jackson" while improving its own situation regarding the missing witness and the time within which it needed to bring Jackson to trial.

**[\*P24]** The State opposed the motion to dismiss, arguing that Sims's comment about the lie detector test "was not induced by the State and was in no way responsive to the question that was asked

of him." The State also pointed out that, during pretrial conferences, the State informed the court and defense counsel that it had cautioned Sims not to mention the polygraph and that Sims had not indicated "any refusal to comply with that request."

**[*P25]** The trial court overruled the motion to dismiss. It found no prosecutorial misconduct, and therefore no double jeopardy, and no violation of Jackson's right to a speedy trial.

**[*P26]** We review the denial of a motion to dismiss on double jeopardy grounds or on speedy trial grounds for an abuse of discretion. *United States v. Jorn*, 400 U.S. 470, 486, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1974); *State v. Cassell*, 2d Dist. Clark No. 09CA0064, 2011 Ohio 23, ¶ 12; *State v. Ross*, 9th Dist Summit No. 20980, 2002 Ohio 7317, ¶ 25.

**[*P27]** "'The double jeopardy clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, protects a criminal defendant from repeated prosecutions for the same offense.' *State v. Draughon*, 10th Dist. Franklin No. 97APA11-1536, 1998 Ohio App. LEXIS 4148 (Sept. 1, 1998), citation omitted. 'When a trial court grants a criminal defendant's request for a mistrial, the double jeopardy clause does not bar a retrial.' *Id*. 'A narrow exception lies where the request for a mistrial is precipitated by prosecutorial misconduct that was intentionally calculated to cause or invite a mistrial.' *Id*, citing *State v. Doherty*, 20 Ohio App.3d 275, 20 Ohio B. 338, 485 N.E.2d 783 (1st Dist. 1984). 'Only where the prosecutorial conduct in question is intended to "goad" the defendant into moving for a mistrial may the defendant raise the bar of double jeopardy to a second trial after having succeeded in ending the first on his own motion.' *Id*, citation omitted." *State v. Simons*, 2d Dist. Champaign No. 99CA5, 2000 Ohio App. LEXIS 5411, 2000 WL 1726904, * 6 (Nov. 22, 2000).

**[*P28]** With respect to prosecutorial misconduct, the trial court concluded that none of the prosecutor's conduct prior to Sims's statement about the lie detector test "would establish, even remotely * * * any prosecutorial misconduct" and that the comment was "not even remotely responsive to the question that had been posed." The court also observed that Sims chose to mention the polygraph test notwithstanding the prosecutor's instructions to Sims that he should not do so. Although the court acknowledged that the course of events resulting in a mistrial arguably benefitted the State,[2] [Footnote omitted] the court found "absolutely no prosecutorial misconduct" and no basis to conclude

24

that the State had intentionally caused a mistrial. The court overruled the motion to dismiss on double jeopardy grounds.

**[\*P29]** The trial court reasonably concluded that no prosecutorial misconduct was involved in Sims's disclosure at trial that he had taken a lie detector test. In the absence of prosecutorial misconduct, double jeopardy did not bar Jackson's retrial, and the trial court properly overruled his motion to dismiss on double jeopardy grounds.

**[\*P30]** The trial court also overruled Jackson's motion to dismiss on speedy trial grounds. R.C. 2945.71, which sets forth the time in which a trial must be held, "does not include any reference whatever to retrials" or mistrials and, therefore, the standard to be applied "is basically reasonableness under the federal and state constitutions." *State v. Fanning*, 1 Ohio St.3d 19, 21, 1 Ohio B. 57, 437 N.E.2d 583 (1982). The holding in *Fanning* "is in accord with the view that the requirements of R.C. 2945.71, et seq. apply only until trial on the charges involved is commenced, and that when the trial terminates in a mistrial the second trial is but a continuation of the same trial proceeding. Therefore, and even though charges remain pending in the interval between the two phases of the same trial proceedings, that interval does not count against a defendant's statutory speedy trial time, so long as the period of time is reasonable." *State v. Morris*, 2d Dist. Montgomery No. 19283, 2003 Ohio 1049, ¶ 17, citing *State v. Roughton*, 132 Ohio App.3d 268, 724 N.E.2d 1193 (6th Dist. 1999). Whether the period is reasonable is determined based on the circumstances of the case, including the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

**[\*P31]** In this case, the trial court correctly observed that Jackson's trial had begun within the time required for a speedy trial, i.e, within 90 days from his arrest, because he was incarcerated. The court also noted that, after a mistrial was declared, the State was allowed "a reasonable time" to bring the defendant to trial again.

**[\*P32]** The mistrial was declared on September 23, 2010. Jackson filed a motion to dismiss on October 8, 2010, and the court overruled the motion on November 10, 2010. The second trial began no later than December 3, 2010. [Footnote omitted.] The court concluded that the schedule in this case "was certainly well within any reasonable period to retry [Jackson]." We agree that this

> delay was reasonable under the circumstances, and the record does not suggest that the State protracted the delay in hopes of finding its witness or for any other improper purpose. The trial court did not abuse its discretion in overruling Jackson's motion to dismiss on speedy trial grounds.
>
> **[\*P33]** Jackson's second and seventh assignments of error are overruled.

*State v. Jackson, supra.*

In his Reply, Jackson argues a second trial was precluded because he sought the mistrial "after the prosecutor has asked a witness [Dion Sims] a prejudicially improper question." (Reply, Doc. No. 9, PageID 2006.)

Jackson argues in his Objections that Sims' statement about why he changed attorneys – i.e., because he had taken a lie detector test – was false, the State knew it was false, but the State failed to correct the falsity and allowed Judge Tucker to rely on it in declaring a mistrial and finding no prosecutorial misconduct (Objections, Doc. No. 14, PageID 2159-65).

As proof of the "real" reason why Sims changed lawyers, Jackson refers the Court to Docket No. 6-2 at PageID 564 which is yet another Trotwood Police Report, this time of Detective Pigman's March 29, 2010, interview with Sims. *Id.*  In that report Pigman says Cynthia Thompson told him Sims had not kept his appointment with her on the preceding Friday. David Mesaros, who was representing Sims during the interview, stated Sims changed lawyers because Thompson was his cousin.  There is no record in that document of any statement by Sims himself as to why he changed lawyers.  Furthermore, the report in question is attached to Jackson's *pro se* Motion for Leave to File a Delayed Motion for New Trial filed in the Common Pleas Court May 17, 2013, in which Jackson makes the same argument about prosecutorial misconduct made in his Objections.

Jackson's argument is that the first trial was not going well for the State so they

essentially provoked the mistrial by asking a question and then not correcting the materially false answer.

Jackson has not proven that Sims' testimony about why he changed lawyers is materially false. All it has proven is that attorneys Thompson and Mesaros gave reasons different from one another and different from what Sims testified to in open court. This is insufficient to undermine Judge Tucker's conclusion that the mention of the lie detector test came out without any misconduct by the prosecutor. Moreover, whatever the police report shows, it was not before the court of appeals when it considered the direct appeal because the appellate decision was handed down almost a year before Jackson filed the delayed new trial motion. Indeed, that claim was never before the court of appeals because Judge Tucker denied the motion for new trial and Jackson never appealed.

"Once jeopardy attaches, prosecution of a defendant before a jury other than the original jury, excluding any contemporaneously empaneled and sworn alternates, is barred unless (1) there is a 'manifest necessity' for a mistrial or (2) the defendant either requests or consents to a mistrial." *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996); *see also United States v. Larry*, 536 F.2d 1149, 1152 (6th Cir. 1976). In this case Jackson, through counsel, moved for a mistrial the very second the words "lie detector" were out of Sims' mouth.

In *United States v. Jorn*, 400 U.S. 470 (1971), the Court had held that a mistrial brought about with the consent of the defendant would bar reprosecution if the circumstances prompting the mistrial motion were brought about by prosecutorial or judicial overreaching. What would be necessary to constitute such overreaching was specified by the Court in *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982), where the Court held that "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial" will the Double Jeopardy

27

Clause bar retrial. There was no evidence before Judge Tucker or the court of appeals of any "goading" conduct by the prosecutor.

As to the evidence, such as it is, in the police report regarding the Sims' interview, Jackson has procedurally defaulted on any such claim by not appealing to the Second District from the denial of his Motion for Leave to File a Delayed Motion for New Trial. Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainwright*. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94, 97 (6th Cir.), *cert denied,* 474 U.S. 831 (1985). Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)(citations omitted). As noted above, the procedural default is not excused by Jackson's claimed actual innocence.

Jackson's Second Ground for Relief should be dismissed with prejudice.


**Ground Three: Prosecutorial Misconduct**


Jackson's Third Ground for Relief as pled in the Petition reads:

> **GROUND THREE:** Thomas Horn was no more than [a] guilty person, who used the State as a "Get Out Of Jail Card" as long as he would do whatever the State ask[ed] to help them obtain a conviction against someone the State knew was innocent, Petitioner should have been able to confront Mr. Horn.

(Petition, Doc. No. 1, PageID 11.)

Respondent asserted this Ground for Relief failed to state a cognizable constitutional claim, but the Report read it as a claim that the State had used Horn's testimony even though it

28

knew the testimony was false (Report, Doc. No. 10, PageID 2025).  This is consistent with Jackson's argument in his Reply (Doc. No. 9, PageID 2007-08).  It is here that Jackson most concisely states his theory of actual innocence:  "Petitioner contends that Thomas (Tom Tom) Horn and his cousin Brandon Henderson conspired with Shevonda Leslie, the deceased Antione West's girlfriend, to rob her boyfriend Antione West, something went wrong during the robbery and Antione ended up getting killed."  *Id.*  at PageID 2007.

The Report found that Jackson had made no such claim in the state courts (Report, Doc. No. 10, PageID 2035).  It found instead that the only claims made in the state courts with any parallel were the Tenth and Eleventh Assignments of Error on direct appeal.  The Report then quoted the Second District's opinion on these two assignments of error and concluded it was not an objectively unreasonable application of clearly established Supreme Court precedent *Id.* at PageID 2042.

Jackson's argument in his Tenth Assignment of Error was that the State should not have been permitted to impeach Thomas Horn with his prior statements which were inconsistent with his deposition testimony which was played at trial.  The court of appeals decided that question purely as a matter of Ohio evidence and trial procedure law; it was not fairly presented to that court as a claim that the State knowingly used Horn's perjured testimony in violation of *Giglio v. United States*, 405 U.S. 150, 153 (1972), or *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The Eleventh Assignment of Error was broader, claiming prosecutorial misconduct by

> improperly bolstering Horn's prior statements, by presenting the perjured testimony of Tahira Elamin, by improperly arguing that Horn's prior statements were "evidence to be used to prove the identity of appellant as the shooter," and by commenting in closing argument that details of a phone call Sims received the night of the shooting were unavailable because of a defense objection.

*State v. Jackson, supra*, ¶ 88.

The Second District found there was not improper bolstering because, while the impeaching questions posed to Horn, "brought Horn's prior statements to the jury's attention, it did not vouch for them" *Id.* at ¶ 91. Respecting Tahira Elamin's testimony, the Second District actually found it was improper defense counsel conduct to suggest she committed perjury. *Id.* at ¶ 94. Obviously not every witness's misdescription of another person is perjured. Defense counsel had an ample opportunity to cross-examine on Elamin's physical description of the person she saw running from the building after the shooting. The court of appeals found the prosecutor did not make the argument attributed to the prosecutor in this Assignment of Error. *Id.* at ¶ 95. And finally, Judge Tucker had sustained a defense objection to the closing argument statement about why the jury had not heard the content of Dion Sims' 911 call and instructed the jury not to speculate about it. The Second District concluded "[i]n our view, there is no possibility that this comment affected the outcome of the trial." *Id.* at ¶ 97.

Jackson objects first that the record refutes the prosecutor's claim of surprise and affirmative damage made in support of its request to impeach its own witness. The critical point here is that there is no prohibition in the United States Constitution on a party impeaching its own witness and Jackson points to no Supreme Court precedent holding such impeachment to be prosecutorial misconduct.

With respect to the decision on the Eleventh Assignment of Error, Jackson repeatedly cites *Giglio* and *Napue, supra,* as if they hold that a prosecutor commits unconstitutional misconduct if the prosecutor does not call to a jury's attention all the inconsistencies in a witness's testimony. Supreme Court precedent requires no such thing. Exposure of inconsistencies in a witness's in court testimony or between that testimony and the prior

statements of the witness is the responsibility of defense counsel.  Weighing those inconsistencies is the responsibility of the jury.  Failure of a prosecutor to point out inconsistencies does not amount to suborning perjury.

The Second District's decision on this claim for relief is not an objectively unreasonable application of the relevant Supreme Court precedent, which it cites, to wit, *Smith v. Phillips,* 455 U.S. 209 (1982), and *Darden v. Wainwright*, 477 U.S. 168 (1986).  Jackson's Third Ground for Relief should be dismissed with prejudice.


**Grounds Four, Five, Six, and Ten:  Insufficient Evidence**


While Jackson quarreled with the Report's lumping in Ground One, he agrees in his Objections that Grounds Four, Five, Six, and Ten should be considered together as establishing his claim that his convictions are based on insufficient evidence (Objections, Doc. No. 14, PageID 2170).

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .  This familiar standard gives full play to the

> responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007).  This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991).  Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt.  *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and

then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (*per curiam*). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062 (2012)(*per curiam).*

A habeas court cannot consider post-trial evidence in deciding a *Jackson v. Virginia* claim.  *McDaniel v. Brown*, 558 U.S. 120 (2010).

Jackson's whole argument on these combined Grounds for Relief asserts inconsistencies in the testimony of various State's witnesses.  For example, he notes that his physical description does not match the description Tahira Elamin gave to police of the person she saw fleeing the scene (PageID 2170-72).  He makes much of the fact that witnesses testified both of the victim's pockets were pulled inside out whereas Evidence Technician Crist's report says only that the right pocket was pulled inside out.  Of course, the Crist report cannot be used to show there should be no deference under 28 U.S.C. § 2254(d)(1) because it was not before the Second District.  *McDaniel, supra.*  But more fundamentally that is an appropriate argument to make to a jury or to an Ohio appellate court on a manifest weight claim, but inconsistencies in the evidence are not inconsistent with there being sufficient evidence to convict.  So long as there is

admissible evidence on each element which the jury could believe, the evidence is sufficient to withstand a challenge under *Jackson v. Virginia*, *supra*.  The evidence recited by the Second District in denying the Fifth Assignment of Error, quoted at length in the Report, meets that standard.

At the end of this section of the Objections, Jackson asserts:  "Finally, petitioner contends that the magistrate judge in his finding [did] not respond to the claim jury not being given any instructions orally or written and the record supports such facts."  (Objections, Doc. No. 14, PageID 2178.)

There is no ground for relief in the Petition which pleads that the jury was not instructed. In his Reply in the section devoted to the Fifth Ground for Relief, Jackson writes: "Petitioner contends that the failure of the trial court to give a [sic] oral jury instruction deprived him of due process and the equal protection of the law under the Fourteenth Amendment to the United States Constitution."  (Reply, Doc. No. 9, PageID 2010.)  Here again Jackson is trying to add a claim to the Petition by inserting it as an argument in the Reply, depriving the State of an opportunity to respond under the Habeas Rules.

This claim was certainly not fairly presented to the state courts.  None of the eleven assignments of error pled in the Second District Court of Appeals mentions a failure to give instructions.  The trial transcript reflects an extensive jury charge conference (Trial Tr., Doc. No. 6-10, PageID 1788-1803) which apparently continued off the record.  *Id.*  at PageID 1803, ll. 22-23.  The transcript also reflects Judge Tucker's charge as a court exhibit.  *Id.*  at PageID 1815. At PageID 1816, defense counsel says he has no objection to the written instructions as agreed on in the conference.  Judge Tucker's oral instructions are transcribed at PageID 1859-1884. There is no factual substance to the claim the jury was not instructed.

34

Jackson's Fourth, Fifth, Sixth, and Tenth Grounds for Relief should be dismissed with prejudice.

**Ground Seven:  Speedy Trial Violation**

In his Seventh Ground for Relief, Jackson asserts his right to a speedy trial was violated. The Warden asserted that this claim was both non-cognizable and not fairly presented to the state courts (Return of Writ, Doc. No. 7, PageID 1934-36).  In his Reply, Jackson asserted a speedy trial right under Ohio Revised Code § 2945.71, Article I, § 10 of the Ohio Constitution, and the Sixth Amendment to the United States Constitution (Reply, Doc. No. 9, PageID 2011).

The Report construed the Seventh Ground as raising a federal Sixth Amendment claim and recommended that it be found to be procedurally defaulted because it was not fairly presented to the state courts (Report, Doc. No. 10, PageID 2042-44).

Jackson objects that he did fairly present this claim as a constitutional claim to the state courts in three places:  (1) his *pro se*  motion to dismiss of November 4, 2010; (2) his direct appeal on the speedy trial claim (by referencing the motion to dismiss); and (3) his memorandum in support of jurisdiction in the Ohio Supreme Court (again by referencing the motion to dismiss and also by explicitly referencing the Sixth Amendment)(Objections, Doc. No. 14, PageID 2181).

In his *pro se*  Motion to Dismiss, Jackson wrote:

> A motion stating the Defendant was not brought to trial within his 90 day fast and speedy period which would further leave the court in violation of Defendant's constitutional rights.  Stating Defendant's 90 days starts the date and time stamped in incident report against him and day of arrest. *State v. Azbell*, 112 Ohio St. 3d 300, 859 N.E. 2d 532 (2006).

(Doc. No. 6-1, PageID 67.)

In his Brief on Appeal prepared by counsel, the argument is entirely in terms of Ohio Revised Code § 2945.71.  While the November 4, 2010, motion is mentioned, the word "constitution" is not even used.

On his *pro se*  appeal to the Supreme Court of Ohio, Jackson included as his Seventh Proposition of Law, "[w]as this Appellant's 6th Amendment right to a fast and speedy trial violated after the first trial ended in a mistrial?"  (Doc. No. 6-2, PageID 382.)

These three reference points in the state court record do not constitute fair presentation of a Sixth Amendment speedy trial claim to the Ohio courts.  In the Motion to Dismiss, Jackson merely uses the phrase "constitutional rights" without even specifying which part of the Constitution he is relying on.  Those words do not gain in specificity when the Motion to Dismiss is later referenced on direct appeal.  To preserve a federal constitutional claim for presentation in habeas corpus, the claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim.  *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), overruled in part on other grounds by *Thompson v. Keohane,* 516 U.S. 99 (1995); *Riggins v. McMackin,* 935 F.2d 790, 792 (6th Cir. 1991).

Merely using talismanic constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue.  *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir. 2006); *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987); *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *citing Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2nd  Cir. 1984).  Mere use of the words "due process and a fair trial by an impartial jury" is insufficient. *Slaughter*

36

*v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006); *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004)(same). "A lawyer need not develop a constitutional argument at length, but he must make one; the words 'due process' are not an argument." *Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995). If mere use of the words "due process" – which are only contained in two Amendments to the Constitution – are not enough to fairly present a claim, then a fortiori "constitutional rights" is not enough.

But even if the Motion to Dismiss as filed with Judge Tucker were enough, there is no mention of constitutional rights at all in the body of the appellate brief. The claim must be fairly presented at every stage of the state appellate process. *Wagner v. Smith,* 581 F.3d 410, 418 (6th Cir. 2009).

By the time the Memorandum in Support of Jurisdiction was filed, Jackson did explicitly mention the speedy trial right in the Sixth Amendment, but by then it was too late. The Ohio Supreme Court will not consider a claim which was not raised in the court of appeals.

Let us assume, however, that the claim was fairly presented to and decided by the Second District. If that be the case, Jackson must then show that the Second District's decision is contrary to or an objectively unreasonable application of United States Supreme Court precedent on the Sixth Amendment issue. This he also has not done.

Jackson is correct that the Speedy Trial Clause of the Sixth Amendment has been held to be applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Klopfer v. North Carolina,* 386 U.S. 213 (1967).

Analysis under the Ohio Speedy Trial Act, Ohio Revised Code § 2945.71 et seq., is quite different from the Sixth Amendment analysis. The Ohio Supreme Court has fairly rigidly enforced the ninety-day limit in the statute. In contrast, the Supreme Court has developed a four-

part balancing test to use in determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant has asserted his right; and (4) prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530-32 (1972).

Jackson evinces no knowledge of this separate federal constitutional standard. Indeed, his Objections do not cite *Barker v. Wingo, supra*, which is the controlling Supreme Court decision. Instead, he argues that the Second District's failure to enforce the Ohio Speedy Trial statute deprived him of due process (Objections, Doc. No.14, PageID 2183.)

"A mere error of state law is not a denial of due process." *Rivera v. Illinois*, 556 U.S. 148, 158 (2009), *quoting Engle v. Isaac*, 456 U.S. 107, 121, n. 21 (1982). "The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial." *Rivera*, *quoting Spencer v. Texas,* 385 U.S. 554, 563-64 (1967). *See also Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), overruled in part on other grounds by *Thompson v. Keohane,* 516 U.S. 99 (1995)( "A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result on the constitutionalizing of every state rule, and would not be administrable.")

Moreover, the Second District found Judge Tucker did not violate state law in denying the Motion to Dismiss. The appellate court's decision on this point is set out above under Ground Two. It found that Judge Tucker did correctly start the count under Ohio Revised Code § 2945.71 on the date of arrest, that the trial began within the statutory ninety days from arrest, that the statute allows a reasonable time to recommence trial after a mistrial, and that the recommencement in this case was within a reasonable time. *State v. Jackson, supra*, This Court

is bound by the Second District's interpretation of the Ohio statutes.   "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Jackson failed to fairly present any Sixth Amendment claim to the Ohio courts and his Seventh Ground for Relief is therefore procedurally defaulted.   Alternatively, nothing that Jackson has argued persuades this Court that the Second District's decision is contrary to or an objectively unreasonable application of *Barker v. Wingo*.   The Seventh Ground for Relief should be dismissed with prejudice.


**Ground Eight:  Presentation of Unauthenticated Evidence**


Jackson's Eighth Ground for Relief as pled states:

> **GROUND EIGHT:** Petitioner asserts that tainted evidence was placed before the jury that prejudiced my case without first being properly authenticated.

(Petition, Doc. No. 1, PageID 15.)

The Warden argued this claim was not cognizable in habeas corpus because it did not state a claim of violation of federal constitutional rights (Return of Writ, Doc. No. 7, PageID 1936-37).  In his Reply, Jackson argues this claim solely in terms of Ohio R. Evid. 803(6) and 607; no mention is made of any federal constitutional right (Reply, Doc. No. 9, PageID 2013-14).  The Report agreed that this claim was based solely on Ohio evidence law and should be dismissed as noncognizable (Report, Doc. No. 10, PageID 2025).

In his Objections, Jackson presents a number of arguments. None of these arguments were made before the Report was filed, i.e., in the Petition or Reply, and are thus waived. A habeas petitioner cannot introduce new claims in objections under Fed. R. Civ. P. 72. However, for the sake of completeness, the arguments are addressed here.

First he claims admission of hearsay in the form of telephone records violates his Confrontation Clause rights (Objections, Doc. No. 14, PageID 2184, citing *Crawford v. Washington*, 541 U.S. 36 (2004)). Crawford holds "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." However, a business record is not a testimonial statement. Hearsay is admissible without violating the Confrontation Clause if it comes within a firmly rooted exception to the hearsay rule. *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). And the business records exception is certainly firmly rooted.

Second, Jackson argues Paula Papke, the witness from Cincinnati Bell who introduced the cell phone records, was not properly subpoenaed or listed as a trial witness. In part, Jackson relies on Exhibit J which, as a post-trial exhibit, the Court can consider only on the "actual innocence" question. *Pinholster, supra*. No constitutional claim was made on this basis to the Ohio courts and in any event there is no federal constitutional requirement that every State's witness in a criminal trial be listed on the State's pretrial witness list.

Third, Jackson argues the cell phone records were not properly authenticated (Objections, Doc. No. 14, PageID 2184). Proper authentication is purely a question of state evidence law; the Second District's determination of this question, adverse to Jackson, is binding on this Court. *State v. Jackson*, *supra*, ¶¶ 68-76.

Fourth, Jackson argues cell phone records could only be introduced by an expert witness

(Objections, Doc. No. 14, PageID 2184, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)).  *Daubert* is not a constitutional decision and does not purport to impose any constitutional obligation on the States.  Instead, it is a decision under Fed.  R. Evid.  702 which is binding only in federal courts under the Rules Enabling Act.

Fifth, Jackson relies on a memorandum submitted by an attorney in another case which supposedly disproves Ms. Papke's testimony (Objections, Doc. No. 14, PageID 2185).  The citation is incomplete, no copy of the memorandum is furnished, and in any event attorneys are not expert witnesses on cell phone technology.

Ground Eight should be dismissed with prejudice.

## Ground Nine:  Ineffective Assistance of Trial Counsel

Jackson's Ninth Ground for Relief as pled reads:

> **GROUND NINE**: Petitioner asserts that if there has ever been a clearer case of "Ineffective Assistance of Counsel," there can be none greater than the one sub judice, if counsel's actions in the misrepresentation of your Petitioner is to go without sanctions or some form of punishment, effective assistance of counsel is just meaningless words.

(Petition, Doc. No. 1, PageID 16.)

The Report notes that this pleading was completely conclusory and not spelled out in any detail until the Reply was filed (Report, Doc. No. 10, PageID 2026-27).  The Report found that the Petition as supplemented by the Reply did state a federal claim for relief, but that the Second District's decision of the claim was neither contrary to nor an unreasonable application of the

relevant Supreme Court precedent, *Strickland v. Washington*, 466 U.S. 668 (1984), and should therefore be dismissed (Report, Doc. No. 10, PageID 2048).

Jackson objects at great length (Doc. No. 14, PageID 2188-96).  The Magistrate Judge considers his objections *seriatim*.

Jackson objects that his trial attorney, Michael Monta, provided ineffective assistance when he did not object to hearsay statements by Detective Pigman that Horn and Sims had identified Jackson in a photo array and that Papke was custodian of Cincinnati Bell business records.  Applying the second prong of *Strickland*, the Second District found there was no prejudice because each of these witnesses testified to the same fact.  *State v. Jackson, supra,* ¶ 102.  The Objections offer no rebuttal.

Jackson objects that Monta did not object to Pigman's testimony about Sims' conversation with Jackson, asking for his gun back.  The Second District found no deficient performance because Sims' statement to Jackson was not hearsay because not offered for the truth of the content, but merely to show the statement was made and as a predicate for Sims' later statement that Jackson did not give the gun back.  *State v. Jackson, supra,* ¶ 103.  This is plainly a correct application of the hearsay rule, Ohio R. Evid. 801, so an objection would properly have been overruled.  It was therefore not ineffective assistance of trial counsel to fail to make the objection.

Jackson claims Monta should have objected to the lack of authentication of the Cincinnati Bell cell phone records (Objections, Doc. No. 14, PageID 2189-91).  The Second District found no prejudice because it concluded under the Eighth Assignment of Error that admission of the records was not plain error.  *State v. Jackson, supra,* ¶ 104.  Jackson's objections are based on asserted "scientific evidence" which is not of record in this case and was not before the Second

42

District (Objections, PageID 2190-91).  Regarding Detective Pigman's testimony about what the cell phone records showed, the Second District found Monta did in fact object.  *State v. Jackson*, *supra*, ¶ 106.  Jackson offers no refutation.

Jackson claims Monta should have objected to Pigman's testimony about what Horn said in his third interview (Objections, Doc. No. 14, PageID 2192).  The court of appeals concluded there was no ineffectiveness here because Jackson had suggested no basis on which an objection could have been sustained.  *State v. Jackson, supra,* ¶ 107.  Jackson argues about why this testimony was damaging to him, but still provides no basis on which an objection could have been sustained (Objections, Doc. No. 14, PageID 2193).  He argues the Court should consider tendered exhibits A-N on this point, but they cannot be considered in determining whether to defer to the state court decision under 28 U.S.C. § 2254(d)(1).  *Pinholster, supra*

Jackson claims Monta should have objected to various questions posed to Horn by the State during Horn's deposition.  The Second District discussed the difficult strategic problems posed to both sides by Horn's credibility and concludes the decision not to object was a reasonable strategic choice.  *State v. Jackson, supra*, ¶¶ 108-09.  Jackson offers no refutation.  Counsel's tactical decisions are particularly difficult to attack.  *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  Indeed, strategic choices by defense counsel are "virtually unchallengeable."  *Buell v. Mitchell,* 274 F.3d 337, 359 (6th Cir. 2001), *quoting Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984).

**Conclusion**

Having reconsidered the Report in light of the Objections and having further found that Jackson has not established his actual innocence so as to excuse any procedural default, the Magistrate Judge again respectfully recommends the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous.

August 11, 2014.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).